[Crim. No. 12829. In Bank. Aug. 20, 1969.]

In re DONALD ROBERT LANE on Habeas Corpus.

Neyhart, Grodin & Beeson and Duane B. Beeson for Petitioner.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci, Derald E. Granberg and Timothy G. Laddish, Deputy Attorneys General, for Respondent.

BURKE, J.—In October 1967 petitioner was convicted in the Contra Costa County Municipal Court of two misdemeanors: violation of Concord Municipal Code sections 4147[1]

---

[1]Section 4147: ''Every person who remains upon any private property or business premises within the City of Concord, after being notified by the owner or lessee or other person in charge thereof to remove therefrom, is guilty of a misdemeanor.''

remaining on another's property after being notified by the owner to remove therefrom) and 4128[2] (distributing handbills on premises of another without his consent). The Appellate Department of the Contra Costa Superior Court affirmed, and the Court of Appeal, First Appellate District, Division Two, denied habeas corpus without opinion. Petitioner then sought relief from this court, and we issued an order to show cause. Execution of judgment on conviction has been stayed pending our decision herein. As will appear, we have concluded that petitioner's activities were protected as an exercise of free speech.

Petitioner is an officer of a labor union which was involved in a labor dispute with one Lesher, publisher of certain newspapers. On June 17, 1967, petitioner appeared at the Calico Market, a large "super-market-type" grocery store located on Monument Boulevard in Concord, for the purpose of distributing handbills urging customers not to patronize Calico Market because it advertised in newspapers published by Lesher, who was engaged in labor union disputes.

The Calico Market is an individual grocery store, owned and personally operated by one Stewart. It is not part of a chain and is not located in a shopping center. Stewart testified that he holds under lease the 24,000 square feet occupied by the store building "and all of the [customer] parking area in front of the store for 150 feet extending to Monument Boulevard [a public street]," along which a public sidewalk runs.[3] A sidewalk some 10 feet wide runs along and adjacent to the front of the store; two doorways off of it serve as the customer entrances to the store building. The sidewalk is part of the privately owned property and is utilized only as a way between the parking lot and the store. Only the Calico Market is served by the parking area, which is accessible by two driveways from Monument Boulevard, and also by a direct route from the neighboring service station.

On the morning in question petitioner without the consent

---

[2]Section 4128: "No person shall throw or distribute upon any public street or place, and no person shall throw or distribute upon any premises owned, occupied or controlled by another, any handbill, poster, flyer, lodger, or advertisement of any merchandise, profession, business or trade without having first obtained the consent of such other person so to do, provided, that this Section shall not apply to the distribution of newspapers or of the United States Mail."

[3]A witness for petitioner testified that he had "paced" the distance from the building to Monument Boulevard and found it to be some 280 feet. Because Monument curves in front of the market property, the distance apparently varies.

874

of owner Stewart stationed himself on the sidewalk just ou
side one of the doorway entrances to the store and commenc
to distribute handbills. Petitioner did not block ingress
egress of customers, and did not speak to any custome
except to thank them for taking a handbill. Stewart came o
of the store and requested petitioner to leave the premis
pointed out that he could pass out the handbills on the publ
sidewalk adjacent to Monument Boulevard, and warned hi
that if he persisted on the store property Stewart would c
the police. Petitioner stated he intended to pass out handbi
all day long, Stewart then stepped between him and a
proaching customers, petitioner stepped around Stewart
order to reach the customers and in so doing pushed Stewa
back in front of the customers, who were unable to enter t
store, and Stewart "grabbed" for the handbills, which fell
the ground. Stewart's son who clerked in the store, thereup
emerged to assist his father and started to gather up t
handbills. At this point one Lambert, a companion of pe
tioner, "came running down the parking lot" and yell
"That's all right, we've got the picture." Next, the poli
arrived, explained to petitioner that his handbilling an
remaining on the premises without Stewart's consent const
tuted misdemeanors, and when petitioner continued to do bot
arrested him.

A week before this disturbance two persons passing out t
same or similar handbills had been asked to leave the parkin
lot; one did so but the other continued his handbilling unt
the police arrived. Lambert, petitioner's associate, testifie
that because of this prior friction he accompanied petatione
to the market property to witness the disturbance he expecte
to result from further distribution at Calico, and to take phot
graphs.[4] As an outgrowth of the disturbance which did occu
battery charges were lodged against market owner Stewar
Similarly, petitioner was charged with and convicted of vic
lation of the two Concord ordinances. (See *ante*, fns. 1, 2.)

 It is established that peaceful picketing or handbillin
"carried on in a location open generally to the public i
absent other factors involving the purpose or manner of th
picketing, protected by the First Amendment." (*Amalga*
*mated Food Emp. Union Local 590* v. *Logan Valley Plaz*
(1968) 391 U.S. 308 [20 L.Ed.2d 603, 88 S.Ct. 1601, 1605

---

[4] Certain of such photographs were introduced into evidence by peti
tioner at his trial, but are among exhibits he has not brought before thi
court.

] and cases there cited.) Accordingly, petitioner had a
[rig]ht unquestionably under the free speech guaranties to
[di]stribute his handbills on the public sidewalk between Monu-
[m]ent Boulevard and the parking lot of Calico Market, and the
[on]ly constitutional question remaining is whether he had a
[sim]ilarly protected right to distribute them on the privately
[ow]ned sidewalk areas opened by Calico for use by its cus-
[to]mers as the sole means of ingress and egress to and from
[it]s store.

*Marsh* v. *Alabama* (1946) 326 U.S. 501 [90 L.Ed. 265, 66
[S.]Ct. 276], involved distribution of religious literature on
[si]dewalks of the "business block" of a company-owned town,
[wh]ich the opinion relates was used by the residents "as their
[re]gular shopping center." The court states in *Logan Valley*,
[su]pra (pp. 1607-1608 of 88 S.Ct. [391 U.S. at p. 316, 20
[L.]Ed.2d at p. 611]), that in *Marsh*, for First Amendment
[pu]rposes, it had treated such sidewalks as if they had been
[pu]blicly held. *Logan Valley* concerned the validity of a state
[co]urt decision enjoining union picketing on private property
[in] front of one store in a privately owned shopping center
[de]signed to ultimately serve many businesses, but at the time
[se]rving only two stores. In reversing, the court noted that the
[ty]pical suburban shopping center is "a cluster of individual
[re]tail units on a single large privately owned tract" (p. 1611
[of] 88 S.Ct. [391 U.S. at p. 324, 20 L.Ed.2d at p. 615]), and
[th]at in the Logan Valley shopping center "the roadways pro-
[vi]ded for vehicular movement within the mall and the side-
[w]alks leading from building to building are the functional
[eq]uivalents of the streets and sidewalks of a normal municipal
[bu]siness district." (Pp. 1608-1609 [391 U.S. at p. 319, 20
[L.]Ed.2d at p. 612].) The opinion explicitly points out the
[g]rounds and scope of the decision (p. 1609 [391 U.S. at pp.
[3]19-320, 20 L.Ed.2d at p. 612]) : "All we decide here is that
[b]ecause the shopping center serves as the community business
[b]lock 'and is freely accessible and open to the people in the
[a]rea and those passing through,' [citing *Marsh*], the State
[m]ay not delegate [to the private owners] the power, through
[t]he use of its trespass laws, wholly to exclude those members
[o]f the public wishing to exercise their First Amendment
[r]ights on the premises in a manner and for a purpose gener-
[a]lly consonant with the use to which the property is actually
[p]ut.

"We do not hold that respondents, and at their behest the
[S]tate, are without power to make reasonable regulations

governing the exercise of First Amendment rights on the property. Certainly their rights to make such regulations a at the very least co-extensive with the powers possessed States and municipalities, and recognized in many opinions this Court, to control the use of public property. Thus whe property *is not ordinarily open to the public,* this Court h held that access to it for the purpose of exercising Fir Amendment rights may be denied altogether.'' (Ital added.)

At the end of the opinion in *Logan Valley* the court emph sized the adverse effect on First Amendment rights whi would result if businesses were free to isolate themselves the device of surrounding their stores by parking lots: ''Bus ness enterprises located in downtown areas would be subje to on-the-spot public criticism for their practices, but bus nesses situated in the suburbs could largely immunize the selves from similar criticism by creating a *cordon sanitaire* parking lots around their stores. Neither precedent nor poli compels a result so at variance with the goal of free expre sion and communication that is the heart of the First Amen ment.

''Therefore, as to the sufficiency of respondents' ownersh of the Logan Valley Mall premises as the sole support of t injunction issued against petitioners, we simply repeat wh was said in *Marsh* v. *State of Alabama,* 326 U.S. at 506 [9 L.Ed. at 268, 66 S.Ct. at 278], 'Ownership does not alwa mean absolute dominion. The more an owner, for his adva tage, opens up his property for use by the public in genera the more do his rights become circumscribed by the statuto and constitutional rights of those who use it.' Logan Valle Mall is the functional equivalent of a 'business block' and f First Amendment purposes must be treated in substantial the same manner.'' (88 S.Ct. at p. 1612 [391 U.S. at p. 32 20 L.Ed.2d at p. 616].)

In the case at hand we have the identical situation the cou warned against. If we were to hold the particular sidewal area to be ''off limits'' for the exercise of First Amendme rights in effect we would be saying that by erecting a ''*cordo sanitaire*'' around its store, Calico has succeeded in immuni ing itself from on-the-spot public criticism. *Logan Valle* noted (p. 1610 of 88 S.Ct. [391 U.S. at pp. 321-322, 20 L.Ed.2 at p. 614]) : ''Petitioners' picketing was directed solely at on establishment within the shopping center. The berms su rounding the center are from 350 to 500 feet away from th

Weis store. All entry onto the mall premises by customers of Weis, so far as appears, is by vehicle from the roads along which the berms run. Thus the placards bearing the message which petitioners seek to communicate to patrons of Weis must be read by those to whom they are directed either at a distance so great as to render them virtually indecipherable—where the Weis customers are already within the mall—or while the prospective reader is moving by car from the roads into the mall parking areas via the entrance ways cut through the berms. In addition, the pickets are placed in some danger by being forced to walk along heavily traveled roads along which traffic moves constantly at rates of speed varying from moderate to high. Likewise, the task of distributing handbills to persons in moving automobiles is vastly greater (and more hazardous) than it would be were petitioners permitted to pass them out within the mall to pedestrians.''

Here, the *public* sidewalk which Calico suggests is available for First Amendment purposes is located some 150-280 feet from the store. The posted speed limit is 40 miles per hour on Monument Boulevard which adjoins that public sidewalk. The customary manner by which customers reach the market is by automobile and use of the parking lot. Thus, the difficulties and hazards to those attempting to exercise First Amendment privileges are as present here as they were in *Logan Valley.*

In *Schwartz-Torrance Inv. Corp.* v. *Bakery & Confectionary Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921], this court also declared the right to peacefully picket on the sidewalks of a privately owned shopping center whose parking lot and sidewalks served the several leased stores. And in *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353], this court declared that subject to reasonable regulations handbilling in Union Station in Los Angeles was protected as a free speech activity. The opinion points out (p. 847) that Union Station is owned by three railroad companies; is a spacious area open to the community as a center for rail transportation; also houses a restaurant, snack bar, cocktail lounge and magazine stand; is open to free entry and use of waiting room facilities by passengers and their friends and relatives; that entry is also free to those who seek food or drink or magazines and newspapers; that (p. 851) so far as privacy rights were concerned a railway station is like a public street or park, and that noise and commotion are characteristic of the normal operation of such a station.

The only significant distinction between the cases cited and

the instant case is the more limited purposes for which th particular sidewalk is designed to serve; here, the customer of one store, and in the other cases customers of two or mor stores, or as a route of access to other places or purpose Certainly, this sidewalk is not private in the sense of no being open to the public. The public is openly invited to use in gaining access to the store and in leaving the premise Thus, in our view it is a public area in which members of th public may exercise First Amendment rights.

Certainly the paramount and preferred place given to th First Amendment freedom of speech right in our democrat system (see *Weaver* v. *Jordan* (1966) 64 Cal.2d 235, 241 [4 Cal.Rptr. 537, 411 P.2d 289]) should be accorded precedenc over the mere "naked title" (see *Logan Valley, supra,* 1611 of 88 S.Ct.) of market owner Stewart's interest in th premises.

Although in *Schwartz-Torrance Inv. Corp.* v. *Bakery Confectionery Workers' Union, supra,* 61 Cal.2d 766, 772-77 this court itself noted certain distinctions between the sho ping center and similar cases involving "quasi-public places on the one hand, and the single retail store or busines establishment on the other, we see no conflict between th United States Supreme Court decision in *Logan Valle supra,* our own decision in *Schwartz-Torrance, supra,* and ou decision in the case at hand. ■■ We believe that the basi principles established by those decisions are equally applica ble to this case. In essence they hold that when a busines establishment invites the public generally to patronize i store and in doing so to traverse a sidewalk opened for acces by the public the fact of private ownership of the sidewal does not operate to strip the members of the public of thei rights to exercise First Amendment privileges on the sidewal at or near the place of entry to the establishment. ■■ I utilizing the sidewalk for such purposes those seeking to exer cise such rights may not do so in a manner to obstruct o unreasonably interfere with free ingress or egress to or fro the premises.

In the light of this conclusion we need not consider peti tioner's contention that jurisdiction over his handbillin activities is preempted under the National Labor Relation Act. (See *Schwartz-Torrance Inv. Corp.* v. *Bakery & Confec tionery Workers' Union, supra,* p. 775 of 61 Cal.2d; *In r Zerbe* (1964) 60 Cal.2d 666, 670 [36 Cal.Rptr. 286, 388 P.2 182, 10 A.L.R.3d 840].)

The petition for a writ is granted and petitioner is ordered discharged from custody.

Traynor, C. J., McComb, J., Peters, J., Mosk, J., Sullivan, J., and Molinari, J. pro tem.,* concurred.