[Civ. No. 12616. Third Dist. Jan. 21, 1971.]

ROBERT H. SIMPSON, Plaintiff and Appellant, v.
THE MUNICIPAL COURT FOR THE SACRAMENTO
JUDICIAL DISTRICT OF SACRAMENTO COUNTY,
Defendant and Respondent;
THE PEOPLE, Real Party in Interest and Respondent.

593

## COUNSEL

Kenneth M. Wells, Public Defender, for Plaintiff and Appellant.

Paul N. Halvonik, Charles C. Marson and Joseph Samuel as Amici Curiae on behalf of Plaintiff and Appellant.

No appearance for Defendant and Respondent.

Thomas C. Lynch, Attorney General, Edsel W. Haws and Daniel J. Kremer, Deputy Attorneys General, for Real Party in Interest and Respondent.

## OPINION

**FRIEDMAN, Acting P. J.**—Appellant Robert H. Simpson is the defendant in a pending misdemeanor prosecution in the Sacramento Municipal Court. The charge is picketing within the state Capitol, in violation of section 171f, subdivision 3, of the California Penal Code.[1] ▮ Asserting the

---

[1]Penal Code, section 171f, provides:
"No person or group of persons shall willfully and knowingly: 1. Enter or remain within or upon any part of the chamber of either house of the Legislature unless authorized, pursuant to rules adopted or permission granted by either such house,

statute's unconstitutionality, he petitioned the superior court for a writ of prohibition restraining his prosecution. The writ was an appropriate remedy. (*Rescue Army* v. *Municipal Court* (1946) 28 Cal.2d 460, 463-467 [171 P.2d 8].) He appeals from a denial of relief, contending that the ban on picketing within the state Capitol violates the freedoms of speech and petition secured to him by the First Amendment and protected against state invasion by the Fourteenth Amendment of the federal Constitution and article I, sections 9 and 10, of the California Constitution.

There is no charge here of violent, boisterous behavior, of "fighting words" or of obstructive or disruptive activity. ■ Indeed, since subdivision 2 of the statute prohibits activity which disrupts the orderly conduct of official business, we construe subdivision 3 to forbid peaceable, nonobstructive picketing within the interior of the state Capitol building.

■ We commence with the generalization that peaceful picketing in labor disputes and for political purposes, carried on in locations open generally to the public, is protected by the First Amendment. (*Amalgamated Food Emp. Union Local 590* v. *Logan Valley Plaza* (1968) 391 U.S. 308, 313 [20 L.Ed.2d 603, 608, 88 S.Ct. 1601]; *In re Lane* (1969) 71 Cal.2d 872, 874 [79 Cal.Rptr. 729, 457 P.2d 561]; see Note, Nonlabor Picketing or Boycott, 93 A.L.R.2d 1284.) The generalization has an important qualification. ■ Peaceful picketing involves elements of both communication and conduct, that is, patrolling; hence valid state interests permit certain controls which would be impermissible if applied to pure speech.

---

to enter or remain within or upon a part of the chamber of either such house; 2. Engage in any conduct within the State Capitol which disrupts the orderly conduct of official business; 3. Picket within the State Capitol. A violation of this section is a misdemeanor. As used in this section, 'State Capitol' means the building which is intended primarily for use of the legislative department and situated in the area bounded by 10th, L, 15th, and N Streets in the City of Sacramento.

"Nothing in this section shall forbid any act of any Member of the Legislature, or any employee of a Member of the Legislature, any officer or employee of the Legislature or any committee or subcommittee thereof, or any officer or employee of either house of the Legislature or any committee or subcommittee thereof which is performed in the lawful discharge of his official duties."

Section 171f was enacted by chapter 1528, Statutes of 1969, which included the following declaration of legislative purpose: "The Legislature finds and declares that the right to freedom of speech must be zealously guarded. There are, however, other fundamental rights which must also be protected from coercion, intimidation and distracting influences. These rights include the right of an elector to cast a secret ballot; the right of the people to freely assemble for the common good; and the right of people to instruct their representatives and to petition the Legislature for redress of grievances.

"Provision for the protection of the right of the elector has already been enacted into law. It is the intent of the Legislature in creating this statute to similarly protect the citizen who wishes to instruct his representatives and petition his legislators from activities within the Capitol Building which are inimical to the free and orderly presentation of such instruction and to the calm and thoughtful consideration thereof."

(*Amalgamated Food Emp. Union Local 590* v. *Logan Valley Plaza, supra,* 391 U.S. at p. 313; *In re Berry* (1968) 68 Cal.2d 137, 152 [65 Cal.Rptr. 273, 436 P.2d 273].)

Here the statute foreseeably focuses on picketing as an instrument of political persuasion and protest. Picketing is but one form of symbolic behavior aimed at achieving political results. Varying mixtures of "speech plus action" have evoked claims of First Amendment protection.[2] The pervading theme is the First Amendment's proscription of limitations on speech-connected activities except in "carefully restricted circumstances" reasonably designed to protect some legitimate public interest. (*Tinker* v. *Des Moines Community School Dist., supra,* 393 U.S. at p. 513 [21 L.Ed.2d at p. 741]; *Cox* v. *Louisiana, supra,* 379 U.S. at p. 553 [13 L.Ed.2d at p. 483]; *In re Hoffman* (1967) 67 Cal.2d 845, 849 [64 Cal.Rptr. 97, 434 P.2d 353]; Kalven, *The Concept of the Public Forum,* 1965 Supreme Court Rev., pp. 1-32.)

Location of the picketing, not its manner or purpose, is the pivotal factor here. ■ Streets, sidewalks, parks and to some extent other public places are so historically associated with the exercise of First Amendment rights that access to them for the purpose of exercising these rights cannot be denied broadly and absolutely. (*Amalgamated Food Emp. Union Local 590* v. *Logan Valley Plaza, supra,* 391 U.S. at p. 315 [20 L.Ed.2d at p. 610], and cases cited; *Diamond* v. *Bland,* 3 Cal.3d 653, 657-658 [91 Cal. Rptr. 501, 477 P.2d 733].) Given the validity of some limited regulation, there remains the necessity of finding a demarcation between the constitutionally permissible and impermissible. As good a measure as any is that suggested by Justice Frankfurter, who described the problem as a reconciliation between the free expression of ideas in public places and protection of the "primary use" of those places.[3] The inquiry should be infused with a healthy

---

[2]See, for example, *Tinker* v. *Des Moines Community School Dist.* (1969) 393 U.S. 503 [21 L.Ed.2d 731, 89 S.Ct. 733], symbolic armbands in public school; *United States* v. *O'Brien* (1968) 391 U.S. 367 [20 L.Ed.2d 672, 88 S.Ct. 1673], draft card burning; *Cameron* v. *Johnson* (1968) 390 U.S. 611 [20 L.Ed.2d 182, 88 S.Ct. 1335], picketing outside courthouse; *Adderley* v. *Florida* (1966) 385 U.S. 39 [17 L.Ed.2d 149, 87 S.Ct. 242], demonstration on jail premises; *Brown* v. *Louisiana* (1966) 383 U.S. 131 [15 L.Ed.2d 637, 86 S.Ct. 719], racial sit-in at public library; *Cox* v. *Louisiana* (1965) 379 U.S. 536 [13 L.Ed.2d 471, 85 S.Ct. 453], and *Cox* v. *Louisiana* (1965) 379 U.S. 559 [13 L.Ed.2d 487, 85 S.Ct. 476], demonstration outside courthouse and jail; *Edwards* v. *South Carolina* (1963) 372 U.S. 229 [9 L.Ed.2d 697, 83 S.Ct. 680], demonstration on State Capitol grounds; *Garner* v. *Louisiana* (1961) 368 U.S. 157 [7 L.Ed.2d 207, 82 S.Ct. 248], racial sit-in at lunch counter; *Cox* v. *New Hampshire* (1941) 312 U.S. 569 [85 L.Ed. 1049, 61 S.Ct. 762, 133 A.L.R. 1396], parade.

[3]*Niemotko* v. *Maryland* (1951) 340 U.S. 268, 276 [95 L.Ed. 267, 272, 71 S.Ct. 325]. While expressed in a concurring opinion, Justice Frankfurter's "primary use" rule epitomizes the essential holdings of other cases. See, e.g., *Kovacs* v. *Cooper*

bias in favor of the challenged freedom. The cure of slight inconveniences or annoyances will not justify the regulation. (*Cox* v. *Louisiana, supra,* 379 U.S. at p. 564 [13 L.Ed.2d at p. 492].) "In every case, therefore, where legislative abridgement of the rights is asserted, the courts should be astute to examine the effect of the challenged legislation. Mere legislative preference or beliefs respecting matters of public convenience may well support regulation directed at other personal activities, but be insufficient to justify such as diminishes the exercise of rights so vital to the maintenance of democratic institutions. And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the cricumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the rights." (*Schneider* v. *State, supra,* 308 U.S. at p. 161 [84 L.Ed. at p. 165].)

The location is the interior of a designated public building, the State Capitol of California. The constitutional inquiry gains piquancy because the Capitol building is devoted, in fact and as a matter of law, primarily to the use of the state Legislature.[4] We take judicial notice of certain facts concerning the building, its surroundings and its use. (Evid. Code, § 452, subd. (g).) Although limited portions of the Capitol house the offices of the Governor and several other constitutional officers, the major part of the building is occupied by the Senate and Assembly chambers, legislative committee hearing rooms, individual offices of the state's 120 legislators, offices of the Legislature's legal, administrative and consultative staffs and facilities for the press and broadcasters. Extensive corridors interlace the complex of facilities and offices. During legislative sessions many citizens visit the legislators' offices and committee rooms, acting as paid or volunteer advocates for varying points of view. Tourists throng the halls and chamber galleries, having no viewpoint to express but feeling a sense of proprietary participation in self-government. Organized groups of school children come to the Capitol by bus, under the superintendence of teachers, to gain impressions of government processes.

---

(1949) 336 U.S. 77, 87-88 [93 L.Ed. 513, 522-523, 69 S.Ct. 448, 10 A.L.R.2d 608]; *Cox* v. *New Hampshire, supra,* 312 U.S. at pp. 574-575 [85 L.Ed. at pp. 1052-1053]; *Schneider* v. *State* (1939) 308 U.S. 147, 160 [84 L.Ed. 155, 164, 60 S.Ct. 146]; *Wollam* v. *City of Palm Springs* (1963) 59 Cal.2d 276 [29 Cal.Rptr. 1, 379 P.2d 481].

[4]Government Code section 9106: "The State Capitol Building is intended primarily for the use of the legislative department and, except as otherwise provided in this article, shall be devoted exclusively to such use."

Government Code section 9108: "The first floor of the annex of the State Capitol is excepted from the provisions of this article. Such excepted space shall continue under the control of the Department of General Services. All other space in the State Capitol Building and all annexes and additions thereto shall be allocated from time to time by the Joint Committee on Legislative Organization in accordance with its determination of the needs of the Legislature and the two houses thereof."

Surrounding the building is the State Capitol Park, occupying an area of 10 square blocks. A broad plaza lies outside the capitol's west entrance and a small one at the east entrance. The west plaza is the frequent site of civic and ceremonial occasions, of concerts, receptions for visiting dignitaries, public meetings and demonstrations. Pickets urging a wide variety of viewpoints often stand or walk outside the west entrance and, less frequently, at the building's other entrances. Distribution of handbills and solicitation of petition signatures are customary activities outside the capitol entrances, particularly at the west plaza.

Parks, streets and courthouse grounds are devoted to uses which are neutral, even antithetical, to political expression. (See *Cox* v. *Louisiana, supra,* 379 U.S. at p. 562 [13 L.Ed.2d at p. 491]). Not so a state capitol. The primary use of the building invites the exercise of First Amendment freedoms. "The greatest of all the forces that influence the legislator is public opinion."[5] Chief Justice Hughes once described free political discussion as the essential means for the attainment of responsive government and for change by lawful means. (*Stromberg* v. *California* (1931) 283 U.S. 359, 369 [75 L.Ed. 1117, 1123, 51 S.Ct. 532, 73 A.L.R. 1484].) The vitality and responsiveness of the legislative process demand legislative accessibility to the individual and collective appeals and protests of citizens. Picketing the Capitol corridors is not only an appeal to public opinion; it is an appeal to the Legislature. The delicacy of balance is intensified here, because the building's primary use requires assurances of free discussion and openness to petition.

Obedient to the mandate of *Schneider* v. *State,* we appraise "the substantiality of the reasons advanced" in support of the challenged statute. The Legislature was at some pains to describe its purpose to protect citizen-visitors from physical activity which it deemed inimical to the orderly discussion and thoughtful consideration of legislative problems. (See fn. 1, *supra.*) ▆▆ Since subdivisions 1 and 2 of section 171f aim at activities within the legislative chambers and other places where official business is transacted, the ban on picketing in subdivision 3 bears principally upon activity in the Capitol corridors. The declaration of legislative purpose rests upon dual assumptions: first, that picketing in the corridors creates an oppressive atmosphere which discourages and repels citizen-visitors; second, that picketing the Legislature at that location debases the quality of its deliberative processes.

▆▆ The statutory declaration describes a legitimate interest in pro-

---

[5]Luce, Legislative Principles (1930) p. 535. An analytical treatment, exposing both the reaches and limitations of public opinion in relation to the legislative process, is Key, Public Opinion and American Democracy (1961).

tecting the constituents of California from the pressure of patrols in the Capitol halls. Mr. Simpson apparently formed a one-man patrol. Numerous one-man patrols might operate simultaneously, each expressing a different plaint or theme. A number of organized patrols might compete for the best locations. Citizen-visitors vary in age, sophistication, in exposure to social stress, in experience with patrolling pickets and in sensitivity to their emanations of pressure. Many constituents would find these patrols discomfiting, repugnant, even threatening. They would prefer to stay away, to address legislators by other means or not at all. While expressing the pickets' own views, the patrols would tend to chill and repress the views of others. "To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself." (*Kovacs* v. *Cooper, supra,* 336 U.S. at p. 88 [93 L.Ed. at p. 523]; *In re Kay* (1970) 1 Cal.3d 930, 941 [83 Cal. Rptr. 686, 464 P.2d 142].) The very presence of the patrols tends to block the vital lines of communication between legislators and their constituents.

The Legislature has a valid interest in protecting its own processes from the immediate and crowding pressures of these patrols. The Legislature is a deliberative body in which "the exchange of thought and the reasons of the members are essential." (Mason, Manual of Legislative Procedure, Cal. State Printing Office (1953) p. 79.) Its objective is "to secure the mature judgment of the group . . . ." (Sturgis, Standard Code of Parliamentary Procedure (2d ed. 1966) p. 121.) The message of the placarded picket is compressed. He lacks physical space for reasoned exposition. However eloquent, his appeal is a mixture of slogan or exhortation and the purposeful, emotional impact of his extended physical presence. His exclusion creates a kind of *cordon sanitaire,* but one representing a legitimate attempt to protect the level of debate rather than to muffle public opinion. (Cf. *In re Lane, supra,* 71 Cal.2d at p. 876.) Thus *Cox* v. *Louisiana, supra,* sustained a prohibition against courthouse picketing designed to influence judicial proceedings, declaring that "mob law is the very antithesis of due process." (379 U.S. at p. 562 [13 L.Ed.2d at p. 491]; cf. *Edwards* v. *South Carolina, supra.*) The analogy to courthouse picketing is imperfect, because the judicial process repels the intervention of external opinion while the legislative process stands in need of it. The analogy holds water because both at the capitol and the courthouse there exists a relationship between the *desiderata* of the process and the level of communicative activity. Reasoned debate, objective investigation and mature deliberation within the legislative body are hindered rather than helped when closely besieged by the primitive techniques of street appeal.[6]

---

[6]A parallel notion was expressed in The Federalist, No. 71: "The republican principle demands that the deliberate sense of the community should govern the conduct

■ On Mr. Simpson's behalf it is argued that the flat prohibition of picketing is too broad to survive the constitutional challenge, that the Legislature must regulate more narrowly in proximity to the First Amendment. (See, e.g., *Zwickler* v. *Koota* (1967) 389 U.S. 241, 250 [19 L.Ed.2d 444, 451, 88 S.Ct. 391].) Although absolute, the ban on picketing has an appearance of breadth only when seen in isolation. Actually, it is highly selective. Out of the eddies of communication swirling around it—oral and written, informed and uninformed, rational and emotional, majority and minority, conservative and radical, orthodox and heterodox—the Legislature has selected and prohibited a single medium of communicative activity, the patrol within the Capitol building. Freedom of expression does not mean that everyone with opinions or beliefs to express may do so at any time and place; primarily it aims at preventing the preference of some ideas over others. (See *Cox* v. *Louisiana, supra,* 379 U.S. at pp. 554, 574 [13 L.Ed.2d at pp. 483, 498]; Meiklejohn, Political Freedom (1960) pp. 26-28, 81-83; Meiklejohn, *The First Amendment is an Absolute,* 1961 Supreme Court Rev. 245, 257-263.) The present ban selects no preferred viewpoint; does not suppress provocation or challenge. It bans a single mode of communicative technique, the ensign-bearing patrol or picket. Even then, it constricts only narrowly, leaving the picket the entire outside world, including the Capitol grounds, as the site for his appeal to public opinion and legislative action. (Cf. *Edwards* v. *South Carolina, supra; Diamond* v. *Bland, supra,* 3 Cal.3d at pp. 661-662.) The ban is no broader than necessary to meet the legitimate governmental need. Having examined the assumptions underlying the legislative declaration of purpose, we conclude that the statute is an adequately narrow regulation designed to protect a substantial state interest.[7]

of those to whom they intrust the management of their affairs; but it does not require an unqualified complaisance to every sudden breeze of passion, or to every transient impulse which the people may receive from the arts of men, who flatter their prejudices to betray their interests. . . . When occasions present themselves, in which the interests of the people are at variance with their inclinations, it is the duty of the persons whom they have appointed to be the guardians of those interests, to withstand the temporary delusion, in order to give them time and opportunity for more cool and sedate reflection. Instances might be cited in which a conduct of this kind has saved the people from very fatal consequences of their own mistakes, and has procured lasting monuments of their gratitude to the men who had courage and magnanimity enough to serve them at the peril of their displeasure."

[7] *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353], is cited to us as a comparative example of overbreadth. There the California Supreme Court considered a municipal ordinance flatly prohibiting presence in a railway or bus depot of persons not there to transact business or to meet travelers. The court held that the prohibition was broader than necessary to achieve legitimate purposes such as prevention of litter and of interference with the depot's functions; that it failed to preserve the depot as an effective place for the dissemination of ideas; thus that the ordinance unconstitutionally abridged freedom to distribute antiwar leaflets in the depot.

■ One of amici curiae charges a denial of equal protection because the statute destroys a communicative means most needed by the dissident and the poor, leaving the doors open to the paid advocates of special interest lobbies. Because organized pressure groups provide invaluable sources of information, the Legislature has chosen to require disclosure of paid legislative advocates rather than indulge in prohibitory regulations.[8] If the disclosure requirement does not reach all infirmities, it is enough to say that uncured infirmities exist in all branches of government. Progress is spotty and intermittent. The legislative body is not bound to extend its regulation to all cases which it might possibly reach, and an otherwise valid regulation is not nullified by confinement to a narrower field than that conceivably available. (*West Coast Hotel Co.* v. *Parrish* (1937) 300 U.S. 379, 400 [81 L.Ed 703, 713, 57 S.Ct. 578, 108 A.L.R. 1330].) We must indeed be chary of attempts to standardize the ideas acceptable to dominant political and community groups. (*Terminiello* v. *Chicago* (1949) 337 U.S. 1, 4-5 [93 L.Ed. 1131, 1134-1135, 69 S.Ct. 894].) Moreover, the dominance of conventional thought may be promoted by selecting communicative media as well as ideas. The present ban does not favor one message over another or one messenger over another. It is aimed at a specific activity, patrol of the Capitol corridors by ensign-bearing persons; it is not discriminatory by failure to prohibit activities of an intrinsically different sort, however related in objective.

■ The prohibition against picketing in the State Capitol is charged with unconstitutional vagueness. ■ An ambiguous law regulating communicative activities will force persons to steer wide of conceivably forbidden conduct; such a statute lends itself to selective enforcement having a "chilling" effect on First Amendment freedoms; thus such a statute may stand only if the prohibited conduct is precisely defined. (*Dombrowski* v. *Pfister* (1965) 380 U.S. 479, 486-487 [14 L.Ed.2d 22, 28-29, 85 S.Ct. 1116]; *In re Kay, supra,* 1 Cal.3d at p. 941.) ■ The verb "picket" is a commonly understood, widely used term describing the conduct of one who patrols an area or stations himself at a place bearing

---

*Hoffman* is not an apt precedent. There the prohibition muzzled all First Amendment freedoms in a place frequented by the public. Here, in contrast, the statute represents a selective prohibition of one of many forms of communicative behavior, a selection premised upon a reasonable appraisal of the behavior's detrimental effect upon the primary use of the public place. (See Note, (1966) 55 Cal.L.Rev. 549, 552.)

[8]See Government Code section 9900 et seq.; *United States* v. *Harriss* (1954) 347 U.S. 612 [98 L.Ed. 989, 74 S.Ct. 808]; *United States* v. *Rumely* (1953) 345 U.S. 41 [97 L.Ed. 770, 73 S.Ct. 543]; Rice, *The Constitutional Right of Association* (1965) 16 Hastings L.J. 491; Comment (1950) 38 Cal.L.Rev. 478; American Pol. Sci. Assn. (Zeller, Ed.) American State Legislatures, p. 214 et seq.; Note, *The Poor and the Political Process: Equal Access to Lobbying* (1969) 6 Harv. J. Legis. 369-392.

some insignia or sign designed to persuade or protest. (See definitions in Webster's Third New Internat. Dict. (1965) and the Random House Dict. of the English Language (1966); *Hughes* v. *Superior Court* (1950) 339 U.S. 460, 464-465 [94 L.Ed. 985, 991-992, 70 S.Ct. 718]; *NLRB* v. *Fruit & Vegetable Packers* (1964) 377 U.S. 58, 77 [12 L.Ed.2d 129, 141, 84 S.Ct. 1063], concurring opinion.) Used in an otherwise valid statute, it defines the regulated or prohibited conduct with requisite precision. (*Cameron* v. *Johnson, supra,* 390 U.S. at pp. 615-616 [20 L.Ed.2d at pp. 186-187]; *Cox* v. *Louisiana, supra,* 379 U.S. at p. 562.)[9]

Judgment affirmed.

Regan, J., and Janes, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied March 16, 1971. Mosk, J., did not participate therein. Peters, J., was of the opinion that the petition should be granted.

---

[9]Although *Thornhill* v. *Alabama* (1940) 310 U.S. 88 [84 L.Ed. 1093, 60 S.Ct. 736], complained of the "vague contours" of the term "picket," the term was there employed in a statute which broadly made it an offense to go near or loiter about a business place for the purpose of dissuading others from doing business there, or to picket the place for the purpose of hindering or injuring lawful business. *Thornhill* invalidated the statute because it prohibited a range of activities which included the peaceful dissemination of information concerning a labor dispute. It does not support the claim that a statute prohibiting picketing at a specified locale is void for vagueness.