[No. G008436. Fourth Dist., Div. Three. July 31, 1991.]

EDWARD ALLRED et al., Plaintiffs and Respondents, v.
DIANA SHAWLEY et al., Defendants and Appellants.

## COUNSEL

Post & Post, Clifford L. Post, Jr., and David L. Llewellyn, Jr., for Defendants and Appellants.

Ronald V. Talmo for Plaintiffs and Respondents.

## OPINION

**SONENSHINE, Acting P. J.**—Appellants appeal an injunction which limits their access to patients of Dr. Edward Allred, owner and operator of Family Planning Associates Medical Group (FPAM). In particular, they object to the court's restraining their entry onto the private parking lot of the professional center in which FPAM is located.

I

Appellants have picketed FPAM for several years, but, until the present controversy, had confined themselves to the public sidewalk areas adjacent to the building in which FPAM is located. When the protest activities escalated to include the private parking lot, Allred sought an injunction.

The petition alleged the protest group was converging "in groups on the cars of plaintiff's patients, employees and volunteers as soon as their vehicles are parked, blocking the above persons from exiting their cars." The pickets "use physical and verbal harassment to intimidate" those attempting to reach the clinic. Patients have become "frightened and upset" and the doctor has found it necessary to "use escorts to assist patients to and from their cars."

In its judgment granting a preliminary injunction, the court found the parking lot was a public forum under *Robins* v. *Pruneyard Shopping Center* (1979) 23 Cal.3d 899 [153 Cal.Rptr. 854, 592 P.2d 341], but tailored time,

place and manner restrictions for its use by the protesters. Pursuant to a later permanent injunction, the court retracted this *Pruneyard* finding and enjoined the defendants from continuing their anti-abortion demonstrations on the private parking lot (see fn. 5, *post.*).

The following recitation is taken from a stipulation of undisputed facts, prepared prior to the hearing on the permanent injunction. Dr. Allred had several clinics operating under the FPAM group. The one at issue is in Cypress and "provides family planning gynecology services including family planning counseling and the following medical/surgical procedures: birth control, pregnancy testing, female sterilization, and abortion."

The building, in which FPAM is one of approximately 10 tenants,[1] consists of "an office building containing approximately 14,000 square feet and an adjoining building which contains approximately 12,000 square feet." FPAM occupies the entire first floor, approximately 50 percent of the building. There is a commonly shared parking lot with 145 parking spaces.

FPAM requires a prior appointment for all its patients (35-45 per day), as do the majority of the other tenants for their clients (80-100 per day). Walk-ins are an infrequent occurrence. Some of the appellants have been on the parking lot areas weekly since October 1986. In August 1987, "no trespassing" signs were posted on the entrances to the parking lot.[2]

Appellants "oppose abortion and one of their principal purposes on the parking lot is to persuade either verbally or by passing out literature, Plaintiff's patients who are there for an abortion from having an abortion. Another purpose is to publicly object to abortion."

Following issuance of the preliminary injunction, the picketing continued, with defendants stationing one person at the door, and assigning others to approach entering vehicles. Statements to the patients include admonitions that abortion is "against God's law."[3] Some "patients have complained that

[1]At that time, the tenants were FPAM, "an orthodontist, an accountant, a psychological counseling office, an insurance agent, a podiatrist, a company which rates the financial stability of insurance companies, a computer software company, and the office of the general managing partner of the office building."

[2]The sign provided:

"No Trespassing

"Entry to Parking Lot & Building Is for Tenants and Their Clients Only

"Violators Will Be Prosecuted

"Penal Code 602"

[3]The following comments had been made in the parking lot: "Don't kill your baby, God is against it, Abortion is a great evil, Abortion is against God's law."

Signs on the sidewalk read: "Edward C. Allred—Doctor or Butcher, Responsible for 3 Women Deaths, 20 Malpractice Suits, 1 Million Babies Murdered, Allred's Death Mill, Babies Killed Here."

they became annoyed and upset by being approached by Defendants . . . in the parking lot."

Following an extended hearing on the complaint for a permanent injunction, the court filed its final (after entertaining objections) statement of decision and judgment. The court retracted its earlier interim decision finding this parking lot was a *Pruneyard* public forum. Preliminarily, it specifically recognized the conflict arising from each side's invocation of rights: free speech and expression by the appellants versus the property rights and business interests of Dr. Allred and the property owner and the privacy rights of the patients.[4]

The court observed there was no challenge to the appellants' ongoing anti-abortion activities conducted on the public nine-foot-wide sidewalks located along the front of the building and the southern perimeter. The former is "32 feet from the front entrance to the building. The building's lobby has only glass doors and windows (which are unshaded) toward the front, so anyone inside the lobby has a clear view of the front public sidewalk. The south public sidewalk is adjacent to the only driveways into the parking lot."

In refusing to allow further proselytizing on the professional center's private parking lot, the court listed numerous factors in support of its decision: continued maintenance of the character of the property as private, interference with Allred's business, the availability of alternative opportunities for communication of appellants' views, and the patients' constitutional right to privacy.[5]

## II

■ Under the First Amendment of the federal Constitution, an owner's property rights weigh heavily in the balance against the exercise of

---

Literature handed out in the parking lot included pamphlets with color pictures of aborted fetuses with "descriptive commentaries," and a "narrative of the unborn child, explain[ing] a fetus' development from the moment of conception to the moment the mother kills her by having an abortion."

[4] Although standing was discussed below, that issue has not been raised on appeal.

[5] Addressed to the named defendants and those participating with them, the injunction restrained entry onto any portion of the professional center, "including but not limited to, the private parking lot to the Building, and the walkways and grass areas on the property, in order to: [¶] 1. Demonstrate, picket, or conduct any expressive activities regarding whether to continue or end a pregnancy. [¶] 2. Physically approach, confront, walk nearby, or follow any patient, prospective patient, employee, or invitee of Plaintiff. [¶] 3. Distribute, broadcast or communicate in any manner, any information, in written or oral form, specifically including, but not limited to, pamphlets and leaflets, regarding whether to continue or end pregnancy."

generalized free speech rights. Only if the free speech rights are heightened, as in the case of union activities, will the activists prevail.

██ California's Constitution is more expansive and has been construed to allow the exercise of those rights on the sidewalks and malls of private shopping centers that cater to the general public. The balance is tipped in favor of the right to voice ideas as opposed to the property rights or mere naked title of the owners. The smaller the business, the more weight the owners' rights will have. As a matter of logic, the likelihood that a group advocating a generalized right to present ideas will wish to use a particular forum declines with that forum's size.

Special circumstances may arise if the ideas or information are effectively dispensed only in a specified location. In this instance, the issues are the degree to which the business has been opened to the public, the amount of disruption of the owner's business which the activity will cause, and the availability of alternative forums.

Both parties cite randomly from the major cases in this area. The following road map will hopefully make travel through the maze easier. Three categories arise, and will be presented in that manner: Those dealing generally with large privately owned shopping centers where the ideas presented are unrelated to the business of the center; those concerned with government institutions at the far end of the "open forum" scale, but where the information sought to be disseminated relates directly to the institution's activities; and those addressing smaller private centers or markets where the speech is related to the business.

### III

#### A. Private Property/Unrelated Speech

In *In re Hoffman* (1967) 67 Cal.2d 845 [64 Cal.Rptr. 97, 434 P.2d 353], antiwar literature was distributed at a private railroad station, open to the public for use of the trains and making purchases in the kiosks and dining areas. The court refused to ban the activity. The protesters, as members of the public, were rightfully on the premises. ██ And their "First Amendment activities [cannot] be prohibited solely because the property involved is not maintained primarily as a [public] forum for such activities." (*Id.* at p. 850.) "[T]he test is not whether petitioners' use of the station was a railway use but whether it interfered with that use." (*Id.* at p. 851.) Because there was no showing of interference, it was unnecessary to examine alternative sites for the communications or to balance competing rights.

Distribution of antipollution information was condoned at a large shopping center in *Diamond* v. *Bland* (1970) 3 Cal.3d 653 [91 Cal.Rptr. 501, 477 P.2d 733]. "[M]odern-day shopping centers, serving as the business districts for the surrounding residential communities, have important public functions, and their owners may not rely on their private ownership to justify blanket prohibitions on First Amendment activities that could lawfully be conducted on public property. Indeed, in many instances the contemporary shopping center serves as the analogue of the traditional town square." (*Id.* at p. 660.) " '[A]n owner who opens his land to the general public for business purposes, to the extent that the land becomes the functional equivalent of a public business district, gives up the right to prohibit the distribution of literature . . . .' " (*Ibid.*)

*Robins* v. *Pruneyard Shopping Center, supra,* 23 Cal.3d 899, the seminal case in this area, addressed distribution of information in the mall of a large shopping center where "[t]he public is invited to visit for the purpose of patronizing the many businesses." (*Id.* at p. 902.) The earlier cases were decided under federal law, which then took a different route and found ownership interests outweighed mere free speech interests. *Pruneyard* was the first to interpret these rights under the California Constitution alone, finding the protection more expansive and overriding property interests as a general rule.

The activity in *Pruneyard* was unobtrusive, i.e., a group of students seated at a card table in a corner, soliciting signatures for a petition. "Their activity was peaceful and apparently well-received by Pruneyard patrons." (23 Cal.3d at p. 902) Noting that California recognizes broader speech rights than the federal Constitution, the court stated, "Members of the public are rightfully on Pruneyard's premises because the premises are open to the public during shopping hours." (*Id.* at p. 905.) Because they are already rightfully on the property, they cannot be denied the right to engage in expressive activity (within limits) on that property. The court examined the burgeoning use of large shopping centers as evidence of "the potential impact of the *public forums* sought here . . . ." (*Id.* at p. 907, italics added.) Thus, the size of the center was a deciding factor: "The largest segment of the county's population is likely to spend the most significant amount of its time in suburban areas where its needs and wants are satisfied; and shopping centers provide the location, goods, and services to satisfy those needs and wants." (*Ibid.*) "Shopping centers to which the public is invited can provide an essential and invaluable forum for exercising [free speech and petition] rights." (*Id.* at p. 910.)

Moreover, more than speech rights were at issue: "Courts have long protected the right to petition as an essential attribute of governing." (23

Cal.3d at p. 907.) And again, the only countervailing right was that of ownership of property.

The court distinguished its situation from " 'the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations [citation] would not markedly dilute defendant's property rights.' [Citation.]" (*Robins* v. *Pruneyard, supra,* 23 Cal.3d 899, 910-911.) The judgment was affirmed by the United States Supreme Court in *Pruneyard Shopping Center* v. *Robins* (1980) 447 U.S. 74 [64 L.Ed.2d 741, 100 S.Ct. 2035]: "We conclude that neither appellants' federally recognized property rights nor their First Amendment rights have been infringed by the California Supreme Court's decision recognizing a right of appellees to exercise state-protected rights of expression and petition on appellants' property." (*Id.* at p. 88 [64 L.Ed.2d at p. 756].)

The court in *H-CHH Associates* v. *Citizens for Representative Government* (1987) 193 Cal.App.3d 1193 [238 Cal.Rptr. 841] also sanctioned presentation of information in a shopping complex, which it termed quasi-private because the center was on land leased from the city. By this point in the evolution of free speech rights, exercisable on privately owned large shopping centers, the emphasis was on the permissible regulations which could be imposed by the property owner: ██ "The exercise of rights of free expression may be restricted when it conflicts with the promotion of countervailing substantial or compelling interests. [Citation.]" (*Id.* at p. 1207.)

The court in *Westside Sane/Freeze* v. *Ernest W. Hahn, Inc.* (1990) 224 Cal.App.3d 546 [274 Cal.Rptr. 51], in allowing leafletting and political talk about peace and disarmament in a large privately owned shopping center, emphasized that *Pruneyard* did not confine speech rights to solicitation of signatures. The injunction provided the center could not bar " 'peaceful and orderly leafletting or speaking of non-commercial ideas, *or any other form of protected political expression* . . . .' " (*Id.* at p. 558, italics added.) The italicized portion was stricken by the court as "circular and indefinite. That is because expression that may be 'protected' by one constitutional provision may not be by another [citations], and expression that may be 'protected' in one location may not be in another. [Citations.]" (*Id.* at pp. 558-559.)

B. *Government-owned Property/Related Speech*

Appellants rely on *Prisoners Union* v. *Department of Corrections* (1982) 135 Cal.App.3d 930 [185 Cal.Rptr. 634] for the proposition a prison parking lot is a public forum. Not so. The court did find the area, *as used by the activists*, was "a peculiarly appropriate forum." (*Id.* at p. 941.) Prisoners Union, a group "concerned with the welfare of prisoners and their families," (*id.* at p. 932) sought to hand out literature on the Soledad Prison parking lot. The court found the protected, speech-related, activity could not be prohibited absent a serious threat to prison security. Several points bear emphasis, in addition to the *government activity* involved. First, the parking lot "is open to members of the general public wishing to visit a prisoner *or to purchase crafts in the prison hobby shop* located in the entrance building." (*Ibid.*, italics added.) Several hundred people entered the lot on weekends. Second, the union requested permission solely to offer literature from a card table near the exit and only to those *leaving* the parking lot: "It offered to inform prison authorities in advance of any such activity, to provide identifications of persons who would come on the grounds, to limit the number of persons who would come, and to stay within a designated area." (*Id.* at p. 933.)

The thrust of the *Prisoners* case was an examination of the limitations that could be placed on speech activities at those public institutions " '[l]east shielded from regulation . . . such as hospitals, jails or military bases.' " (135 Cal.App.3d at p. 935.) In the latter situations, even peaceful speech may be excluded if " 'there is a *basic incompatibility* between the communication and the primary activity of the area.' " (*Ibid.*) The analysis is (*for a government institution*) (1) if the activity is peaceful, lawful, and does not interfere with the functions performed, it cannot be banned; (2) if there is interference, the availability of alternative channels is addressed; (3) "[w]here the relevant audience is found only in a particular place, it has been suggested that '[t]he bare possibility of alternative ways to communicate the same message should not suffice to defeat the first amendment claim.' " (*Id.* at p. 936.) "[T]he parking lot of a prison is, for purposes of the communications proposed, a peculiarly appropriate forum. The relevant audience is gathered there, or not at all." (*Id.* at p. 941.) And there was *no* viable alternative forum.

In *U. C. Nuclear Weapons Labs Conversion Project* v. *Lawrence Livermore Laboratory* (1984) 154 Cal.App.3d 1157 [201 Cal.Rptr. 837], the project opposed the development of nuclear power ongoing at Livermore and sought to display materials and present slide shows at the visitor center. Adopting the approach in *Prisoners Union*, the court noted the "concept [of a public forum] is a continuum, with public streets and parks at one end and

government institutions like hospitals and prisons at the other." (*Id.* at p. 1164.) Thus, it "adopted the 'basic incompatibility' test." (*Ibid.*) The issue then was whether the "Project's distribution of literature and showing of slides about government policies on nuclear weapons and energy is compatible with the 'intended purpose' of the Visitors Center." (*Id.* at p. 1165.) If the government intends "to preclude informed debate—then any literature critical of government policy would be 'incompatible.' " (*Id.* at p. 1166.) But can the government, as a "speaker" itself, "require ideological compatibility?" (*Ibid.*) Not under these circumstances, said the court. The visitors center is owned by the state but is freely open to the public. "Visitors are allowed to roam freely around the Center, to pick up literature, study posters and other displays, and presumably to discuss all that they are exposed to. This environment falls somewhere in the middle of the continuum . . . ." (*Id.* at p. 1168.) The project had a right to present its views at the Center: "Moreover, we consider it critically important for a government facility whose primary purpose is to describe and explain government activity or policy (which certainly includes the work of the Laboratory) to accommodate a meaningful exchange of views by the public." (*Id.* at p. 1169.)

## C. *Private Property/Related Speech*

In *Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union* (1964) 61 Cal.2d 766 [40 Cal.Rptr. 233, 394 P.2d 921], a shopping center owner sought to prohibit picketing of a tenant/bakery by a local union. The union's interest in its peaceful activities was founded on its protected right of freedom of speech, the center's on merely its ownership of the property, which it had "fully opened . . . to the public." (*Id.* at p. 771.) "The center constitutes a conglomeration of business enterprises designed to provide essential services to *all members of the local community*; 'access by the public is the very reason for its existence.' [Citation.] [¶] Plaintiff suffers no significant harm in the deprivation of absolute power to prohibit peaceful picketing upon property to which it has invited the *entire public* . . . . ■ 'The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it.' [Citation.]" (*Ibid.*, italics added.)

In *In re Lane* (1969) 71 Cal.2d 872 [79 Cal.Rptr. 729, 457 P.2d 561], petitioner was convicted of two misdemeanors for distributing leaflets in front of "a large 'super-market-type' grocery store . . . ." (*Id.* at p. 873.) He was an officer in a local labor union involved in a dispute with a newspaper publisher. The leaflets urged the grocery "customers not to patronize [the market] because it advertised in newspapers published by Lesher, who was engaged in labor union disputes." (*Ibid.*)

Finding the petitioner's activities were privileged free speech, the *Lane* court emphasized he "did not block ingress or egress of customers, and did not speak to any customers except to thank them for taking a handbill." (71 Cal.2d at p. 874.) Moreover, there was no viable alternative—"the *public* sidewalk which [the store] suggests is available for First Amendment purposes is located some 150-280 feet from the store." (*Id.* at p. 877.) ▮ Moreover, "when a business establishment invites the public generally to patronize its store and in doing so to traverse a sidewalk opened for access by the public the fact of private ownership of the sidewalk does not operate to strip the members of the public of their rights to exercise First Amendment privileges on the sidewalk at or near the place of entry to the establishment. In utilizing the sidewalk for such purposes those seeking to exercise such rights may not do so in a manner to obstruct or unreasonably interfere with free ingress or egress to or from the premises." (*Id.* at p. 878.)

## IV

▮ In the case of large shopping centers (pt. III A., *ante*), the issues usually are (1) the invitation by its owners to the entire public, (2) the resultant "town square" status of the mall area, (3) the substantial interest of the petitioners in reaching the hundreds or thousands of people who congregate there, and (4) activity by the demonstrators which is both unobtrusive and nondisruptive. This case does not fit the mold. ▮ For *government*-owned properties (pt. III B., *ante*), less regulation is possible; even for those least likely to be described as a public forum, some activity will be allowed.

▮ In the private sector, where there is no large shopping center involved (pt. III C., *ante*), the discussion focuses on the degree of public invitation, the disruption of or interference with the usual business undertaken on the property, and the importance of that particular location for the particular speech presented, i.e., the relationship between the ideas sought to be presented and the purpose of the forum occupants.

▮ Appellants rely heavily on *In re Lane*. However, ours is a different situation. Far from being a retail store, which holds out an invitation to the entire buying public in general, the professional center serviced mainly prearranged clientele. It was not fully open to the local community; nor did it provide services which were essential to all community members, such as in the mall of *Schwartz-Torrance* or the "large 'super-market-type' grocery store" in *Lane*.[6] Retail sales were specifically forbidden on the premises.

[6]The California Supreme Court cites *Lane* for the proposition that "[t]he shopping center has undertaken the public function of providing society with the necessities of life and has

FPAM and the professional center in general are at the opposite end of the continuum from *Schwartz-Torrance* and command a different result because " '[t]he [*less*] an owner, for his advantage, opens up his property for use by the public in general, the [*less*] do his rights become circumscribed by the statutory and constitutional rights of those who use it. [Citation.]" (*Schwartz-Torrance Investment Corp.* v. *Bakery & Confectionery Workers' Union, supra,* 61 Cal.2d 766, 771.) We find sufficient evidence to support the trial court's conclusion the professional center had continually maintained the private character of its parking lot and had not invited the public generally to use the property.

Division One of this court recently addressed a similar situation and reached the same conclusion. In *Planned Parenthood of San Diego and Riverside Counties* v. *Timothy Dee Wilson** (Cal.App.) the defendants were prevented, pursuant to a preliminary injunction, from using the clinic's private parking lot for any antiabortion activities. The reviewing court affirmed, finding the clinic "fundamentally and functionally dissimilar from the shopping center considered in *Robins* and . . . not sufficiently dedicated to public use to entitle the protesters to exercise their rights of expression and assembly in the parking lot of this privately owned and operated facility." There, as here, "there is no space for public parking in general. . . . Although members of the public are invited to avail themselves of the particular services performed by specific tenants providing medical services, they are not invited to congregate, relax, visit, seek out entertainment, browse and shop for personal, household or general business merchandise."

 This determination could conclude the matter. However, other factors weigh heavily in favor of FPAM. The owner of the center has interests other than mere ownership. Those rights in the present case are "freedom from disruption of normal business operations and freedom from interference with customer convenience." (*H-CHH Associates* v. *Citizens for Representative Government, supra,* 193 Cal.App.3d 1193, 1208.) *H-CHH* adopted *In re Hoffman*'s definition of noninterfering activity: "[T]hat which does not interfere with the conduct of business or the use of the property, does not impede the movement of customers or business tenants, does not block access to facilities or businesses, is not noisy and creates no disturbance and does not entail the harassment of uninterested patrons." (*Ibid.*)

become the modern suburban counterpart of the town center." (*In re Cox* (1970) 3 Cal.3d 205, 216, fn. 11 [90 Cal.Rptr. 24, 474 P.2d 992].)

*Reporter's Note: Review granted in D011865 on Supreme Court's motion and cause transferred to Court of Appeal on September 5, 1991, with instructions to vacate opinion and reconsider the matter (S022436). For subsequent opinion, see *Planned Parenthood* v. *Wilson* (1991) 234 Cal.App.3d 1662.

Here, interference with FPAM's business was an avowed purpose of the appellants. Face to face (if not face *in* face) encounters were the rule. Appellants here were approaching Allred's patients while still in their cars in the parking lot, then following them to the door of the building. There is evidence that the petitioners interfered with the patients' access to the building, emotionally upset several patients, and caused such confusion in the parking lot that at least one other tenant has already vacated the premises for this reason. There was no sidewalk in the parking lot or along the back of the building. FPAM was, in fact, forced to hire escorts to ensure unimpeded passage for its patients from their cars to the clinic door. This is a far cry from the situation in *Lane,* where the activist "did not block ingress or egress of customers, and did not speak to any customers except to thank them for taking a handbill." (*In re Lane, supra,* 71 Cal.2d 872, 874.)

Protesters on the lot pose an additional safety hazard to exiting and entering cars. We note recent authority allowing even large shopping centers to entirely ban leafletting in their parking lots. In *Savage v. Trammell Crow Co.* (1990) 223 Cal.App.3d 1562 [273 Cal.Rptr. 302], Division One of this court upheld such a limitation on placing religious tracts on car windows. The regulation was content-neutral—the center prohibited leafletting by anyone, including tenants of the center advertising their own establishments; the activity posed a serious litter problem; it interfered with the ingress and egress of the patrons of the center; and the petitioner could easily hand out the leaflets in person on the sidewalks. Here, the presence of several people continuously walking around and through the parking lot (where there are no walkways in the lot or along the back portion of the building) presents an additional safety hazard, responsibility for which should not be thrust upon the private parking lot owner.

Also important is the lower court's conclusion, amply supported by the evidence, that there was sufficient opportunity to reach the targeted audience. The public sidewalk along the front of the building was but 32 feet from the lobby of the building. And that lobby was entirely unshaded glass, from which patients could easily see placards and billboards. The side street area also had a wide public sidewalk. All patients wishing to park in the lot had to enter across that sidewalk, again giving appellants full access to them. In the present situation, no client of the center can enter either the front door, or the parking lot, without confronting appellants. If the patients are interested in further information, or person to person contact, they have only to stop at the sidewalk. Appellants are not denied access to their quarry. "[T]he protesters' exclusion from the parking lot has not deprived them of an ample opportunity within the traditional public forum of the public sidewalk to

reach [willing listeners]." (*Planned Parenthood of San Diego and Riverside Counties* v. *Timothy Dee Wilson** (Cal.App.).

We note another distinction, i.e., the heightened weight given to the speech rights in *Schwartz-Torrance* and *Lane* because they pertained to union interests: "[U]nobtrusive *union* picketing and handbilling on the sidewalk [in *Lane*] were protected under the First Amendment as against the property rights of the owner-employer. [¶] This series of cases involving *union picketing* in shopping centers establishes constitutional protection for picketing and other First Amendment activities which are related in their purpose to the normal use to which the shopping center property is devoted." (*Diamond* v. *Bland, supra*, 3 Cal.3d 653, 661, italics added.) "[T]he State of California, by statute or judicial decision, may permit union activity on private premises. Our earlier decisions in *Schwartz-Torrance* and *Lane*— rulings which have not been overruled or eroded in later cases—established the legality of *union picketing* on private sidewalks outside a store *as a matter of state labor law*." (*Sears, Roebuck & Co.* v. *San Diego County Dist. Council of Carpenters* (1979) 25 Cal.3d 317, 328-329 [158 Cal.Rptr. 370, 599 P.2d 676], italics added.) Thus, these activists were not merely expressing opinions, but were involved in protected union activity. This assuredly strengthened their interests, which in turn tipped the balance (against the private owner's interest) in their favor.

The *Lane* court *did not address* any activities on the parking lot; yet, that area is the chief concern in this case. And the only "right" against which to balance the petitioner's First Amendment rights in *Lane* was "the mere 'naked title' [citation] of market owner Stewart's interest in the premises." (71 Cal.2d at p. 878.) Here, in addition to property and business interests of the center, we have each woman's constitutional right to privacy. ██ "[I]t is a woman's fundamental right to choose whether to bear children based upon her right of privacy in matters relating to marriage, family and sex." (*People* v. *Garziano* (1991) 230 Cal.App.3d 241, 243 [281 Cal.Rptr. 307].)[7] "If the right of privacy means anything, it is the right of the *individual* . . . to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." (*Eisenstadt* v. *Baird* (1972) 405 U.S. 438, 453 [31 L.Ed.2d 349, 362, 92 S.Ct. 1029].)

██ We find sufficient evidence to support the trial court's determination that the center had maintained the character of its property as private,

---

*See Reporter's Note, *ante*, page 1502.

[7]In *Garziano*, the court held that demonstrators at a family planning clinic could "not criminally interfere with the exercise of constitutional rights by others, and then escape punishment for their criminal conduct by asserting the defense of necessity. Those who choose to break the law under such circumstances because of firmly held beliefs must be prepared to suffer the consequences." (230 Cal.App.3d at p. 244.)

thus precluding a determination the public was free to use the private parking lot as a forum to reach patients of the clinic. The court's findings on the degree of interference with the business and the availability of alternative communication opportunities support this determination.

The judgment is affirmed. Respondents to receive costs on appeal.

Crosby, J., and Wallin, J., concurred.