[No. D038976. Fourth Dist., Div. One. Mar. 6, 2002.]

MICHAEL J. SCHROEDER, Plaintiff and Appellant, v.
IRVINE CITY COUNCIL et al., Defendants and Respondents.

COUNSEL

Reed & Davidson, Dana W. Reed, Bradley W. Hertz; Law Offices of Rick A. Cigel and Rick A. Cigel for Plaintiff and Appellant.

James S. Burling and Harold E. Johnson for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiff and Appellant.

Rutan & Tucker, Joel D. Kuperberg and John A. Ramirez for Defendants and Respondents.

OPINION

**McDONALD, J.**—Appellant Michael J. Schroeder filed this action against the City of Irvine (City), its city council, and four city council members (together respondents) seeking a declaration that respondents' Vote 2000 program was an illegal expenditure of public funds. Schroeder sought an injunction barring further expenditures on the Vote 2000 program and an order under Code of Civil Procedure section 526a[1] requiring the four council members to reimburse City for all City expenditures made for the Vote 2000 program. Respondents moved to dismiss the action under the so-called anti-SLAPP statute (§ 425.16). The trial court applied section 425.16 to Schroeder's lawsuit, concluded he had not shown likelihood of success on the merits, granted the motion to dismiss, and awarded attorney fees to respondents.

Schroeder argues the court erred by denying him the opportunity to conduct discovery before ruling on the motion, by concluding he had not shown a likelihood of success on the merits, and by awarding attorney fees.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise specified.

I

FACTUAL BACKGROUND

### A. The Vote 2000 Program

In November 1999 City authorized funding for the Vote 2000 program, a multifaceted effort to increase voter registration and voter participation in the March and November 2000 elections. The articulated reasons for this program was a concern that voter registration in the City had steadily declined between 1990 and 1998, and a recent special election had attracted participation by only 27 percent of its registered voters. The city manager's report recommending adoption of the Vote 2000 program stated the program would be conducted in a "completely non-partisan manner [and] [n]o attempt will be made to influence voting decisions or advocate a vote for or against any federal, state, or local candidate or ballot issue."

### B. The Anti-airport Initiative: Measure F

City has historically opposed placing a commercial airport (the proposed airport) on land that became available for civilian use after the El Toro Marine Base closed in 1999.[2] Although two prior countywide elections concerning the proposed airport resulted in a majority vote favoring its development, City's citizens overwhelmingly voted against its development in those elections.

In the fall of 1999 Measure F, a countywide initiative that would make it more difficult to develop the proposed airport, qualified for the March 2000 ballot. After Measure F qualified for the ballot, City continued contributing to ETRPA, and ETRPA continued its opposition to the proposed airport. Respondents also conducted a campaign soliciting citizen input on a proposed alternative use for the Marine base property (the Great Park plan) and suggested that using the property for the Great Park plan was superior to using the property for the proposed airport.

---

[2]City has contributed funds to the El Toro Reuse Planning Authority (ETRPA), a coalition opposed to development of the proposed airport that has promoted an alternative nonaviation plan for use of the former Marine base. City also has proposed annexing the Marine base or developing a sports stadium on the portion of the Marine base currently within City's jurisdiction, and has expressed other forms of opposition to the proposed airport.

## II

### PROCEDURAL BACKGROUND

A. *The Proceedings Below*

Schroeder's complaint argued that the purpose and effect of the Vote 2000 program was to campaign for the passage of Measure F, and that it is illegal for a municipality to spend public funds to campaign in favor of particular ballot measures. Schroeder sought (1) a declaration that City's expenditures for the Vote 2000 program were unlawful, (2) an order enjoining further use of taxpayer funds for the Vote 2000 program, and (3) a judgment that the council member-defendants, by voting in favor of the Vote 2000 program, did not use due care and were obligated to repay City for all of City's Vote 2000 program expenditures.

Respondents filed a motion to strike the complaint under section 425.16, arguing that (1) the complaint sought to impose liability on respondents for conduct protected by the First Amendment rights to free speech and petition, and (2) Schroeder could not show a likelihood of prevailing on the merits because the Vote 2000 program was a permissible effort to increase voter registration rather than an unlawful political campaign. Schroeder moved, pursuant to section 425.16, subdivision (g), to continue the hearing on the motion to strike, arguing that he needed to conduct specified discovery to collect evidence demonstrating the likelihood of prevailing on the merits of his claim. The court denied the request to continue the hearing on respondents' motion to strike pending discovery.

Schroeder then filed opposition to the motion to strike, arguing that there was a probability he would succeed on the merits of demonstrating the Vote 2000 program was an unlawful expenditure of municipal funds. He asserted that although City's Vote 2000 program was nominally nonpartisan, the surrounding circumstances showed that its actual purpose and effect was to promote passage of Measure F, and it was therefore an unlawful expenditure for political purposes. Respondents' reply argued that public expenditures are for political purposes only when the expenditure is on a campaign that *expressly advocates* the passage or defeat of a particular measure, and because the Vote 2000 program contained no express advocacy for or against any measure there was no likelihood Schroeder would succeed on the merits. The trial court agreed with respondents and granted the motion to strike.

Respondents moved for attorney fees, arguing that section 425.16, subdivision (c) mandated an award of fees to a prevailing defendant. Schroeder

opposed the motion, arguing that a mandatory award of attorney fees in the context of this case would unconstitutionally infringe on his right to petition for redress of grievances. The court awarded $45,000 in attorney fees to respondents.

### B.   *Contentions on Appeal*

Schroeder raises three principal arguments on appeal. First, he argues his showing below demonstrated a likelihood of successfully proving the expenditures on the Vote 2000 program were unlawful political expenditures. Second, he argues that, assuming his showing was deficient, we must reverse and remand because the trial court abused its discretion by denying him the opportunity to conduct discovery that would have elicited evidence demonstrating the expenditures were unlawful political expenditures. Finally, Schroeder (joined by amicus curiae Pacific Legal Foundation) argues that section 425.16, insofar as it mandates an attorney fee award against a taxpayer who has challenged a governmental program, unconstitutionally infringes on the taxpayer's right to petition for redress of grievances, and therefore we must either construe the statute's attorney fee provision as permissive or declare it unconstitutional.

### III

### THE GENERAL STANDARDS OF SECTION 425.16

The Legislature declared the purpose of the anti-SLAPP statute in section 425.16, subdivision (a): "The Legislature finds and declares that there has been a disturbing increase in lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances. The Legislature finds and declares that it is in the public interest to encourage continued participation in matters of public significance, and that this participation should not be chilled through abuse of the judicial process. To this end, this section shall be construed broadly." In *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 815-816 [33 Cal.Rptr.2d 446], the court noted that: "The paradigm SLAPP is a suit filed by a large land developer against environmental activists or a neighborhood association intended to chill the defendants' continued political or legal opposition to the developers' plans. [Citations.] SLAPP's, however, are by no means limited to environmental issues [citations] . . . . [¶] . . . [¶] SLAPP suits are brought to obtain an *economic* advantage over the defendant, not to vindicate a legally cognizable right of the plaintiff. [Citations.]" ■ A SLAPP suit (strategic lawsuit against public participation) is typically filed to delay and to punish activists by imposing litigation costs on

them for exercising their constitutional right to speak and petition the government for redress of grievances, rather than to prevail on the suit. (*Dixon v. Superior Court* (1994) 30 Cal.App.4th 733, 741 [36 Cal.Rptr.2d 687].)

The anti-SLAPP legislation in section 425.16 was crafted to provide an efficient means of dispatching a plaintiff's meritless claims at the inception of the lawsuit to promote "continued participation in matters of public significance." (§ 425.16, subd. (a).) Accordingly, the filing of a section 425.16 motion to strike stays discovery until the motion is ruled on, although the court has discretion to permit specified discovery for good cause. (*Braun v. Chronicle Publishing Co.* (1997) 52 Cal.App.4th 1036, 1052 [61 Cal.Rptr.2d 58].)

■ Evaluation of a section 425.16 motion to strike involves a two-step process. First, the court decides whether the defendant has made a threshold prima facie showing that the defendant's acts of which the plaintiff complains were taken in furtherance of the defendant's constitutional rights of petition or free speech in connection with a public issue. (*Wilcox v. Superior Court, supra*, 27 Cal.App.4th at p. 820.) In this case, Schroeder conceded below, and does not dispute on appeal, that the first inquiry—whether Schroeder's causes of action challenged acts of respondents taken in furtherance of respondents' rights of free speech or petition—was satisfied here.[3]

---

[3]Amicus curiae argues the first element of the application of section 425.16 is absent here because government has no rights of speech or petition protected by the First Amendment. It is doubtful this claim may be raised for the first time on appeal because the parties below conceded the applicability of the statute. (See, e.g., *Sommer v. Martin* (1921) 55 Cal.App. 603, 609-610.) Even were we to consider this new theory, amicus curiae cites no authority directly holding that acts by government entities or officials are not entitled to First Amendment protection merely because of the status of the entity or the official, and at least two cases have permitted government agencies and officials to use the anti-SLAPP statute to dismiss lawsuits against them. (See *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1114-1117 [57 Cal.Rptr.2d 207]; see also *Mission Oaks Ranch, Ltd. v. County of Santa Barbara* (1998) 65 Cal.App.4th 713, 730 [77 Cal.Rptr.2d 1], disapproved on other grounds in *Briggs v. Eden Council for Hope & Opportunity* (1999) 19 Cal.4th 1106, 1123, fn. 10 [81 Cal.Rptr.2d 471, 969 P.2d 564].) Although we do not categorically hold that all lawsuits against governmental agencies and officials automatically qualify for treatment under section 425.16, the particular facts of this case justify adhering to the parties' theory that the statute applied. Insofar as Schroeder's lawsuit targeted the council members, the basis for their liability was premised on their *vote* in favor of adopting the Vote 2000 program, and voting is conduct qualifying for the protections afforded by the First Amendment. (See, e.g., *Stella v. Kelley* (1st Cir. 1995) 63 F.3d 71, 75-76; *Brewer v. D.C. Financial Responsibility and Manag.* (D.D.C. 1997) 953 F.Supp. 406, 408-409.) Insofar as Schroeder's lawsuit sought relief against the governmental entity, Schroeder's theory was that the Vote 2000 program was invalid because a governmental entity is barred from advocating the *content* of the Vote 2000 program. However, in analogous cases in which a governmental agency was sued based on the content of its speech,

Second, if the defendant satisfies the first element, the burden shifts to the plaintiff to demonstrate that "there is a probability that the plaintiff will prevail on the claim." (§ 425.16, subd. (b)(1); *DuPont Merck Pharmaceutical Co. v. Superior Court* (2000) 78 Cal.App.4th 562, 567-568 [92 Cal.Rptr.2d 755].) Section 425.16, subdivision (b)(2) provides that when considering the motion to strike, the court "shall consider the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based." This requirement has been interpreted to mean that (1) when the trial court examines the plaintiff's affidavits filed in support of the plaintiff's *second step* burden, the court must consider whether the plaintiff has presented sufficient evidence to establish a prima facie case on his causes of action, and (2) when the trial court considers the defendant's opposing affidavits, the court cannot weigh them against the plaintiff's affidavits, but must only decide whether the defendant's affidavits, as a matter of law, defeat the plaintiff's supporting evidence. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co.* (1995) 37 Cal.App.4th 855, 866-867 [44 Cal.Rptr.2d 46].) On appeal, we review de novo the trial court's determination on whether the plaintiff satisfied his burden of making a prima facie showing of facts that, if proven at trial, would support a judgment in his favor. (*Mission Oaks Ranch, Ltd. v. County of Santa Barbara, supra,* 65 Cal.App.4th at p. 721; *Church of Scientology v. Wollersheim* (1996) 42 Cal.App.4th 628, 653 [49 Cal.Rptr.2d 620]; *Wilcox v. Superior Court, supra,* 27 Cal.App.4th at pp. 823-824.)

If the defendant prevails on the motion, section 425.16, subdivision (c) provides that the defendant is entitled to recover costs and attorney fees. (*Braun v. Chronicle Publishing Co., supra,* 52 Cal.App.4th at p. 1052.)

IV

ANALYSIS

A. *The Trial Court Correctly Ruled Schroeder Did Not Prima Facie Show That the Vote 2000 Program Was an Unlawful Expenditure of City Funds*

■ City, as a charter city, has broad discretion to make public expenditures, subject to the limitations that the expenditure be for a public purpose

the courts have permitted the agency to invoke section 425.16 (*Bradbury, supra; Mission Oaks, supra*) or other First Amendment based protections. (See *Nadel v. Regents of University of California* (1994) 28 Cal.App.4th 1251, 1266-1267 [34 Cal.Rptr.2d 188]; *Nizam-Aldine v. City of Oakland* (1996) 47 Cal.App.4th 364, 376-377 [54 Cal.Rptr.2d 781].) Because amicus curiae provides no persuasive authority to the contrary, we conclude the operative facts of this case justify adhering to the parties' theory that the statute applied.

and not expressly forbidden by law. (Cf. *West Coast Adver. Co. v. San Francisco* (1939) 14 Cal.2d 516, 521-522 [95 P.2d 138].) However, a governmental agency may not spend public funds for a partisan campaign advocating the passage or defeat of a ballot measure. (*Stanson v. Mott* (1976) 17 Cal.3d 206, 217 [130 Cal.Rptr. 697, 551 P.2d 1]; *Miller v. Miller* (1978) 87 Cal.App.3d 762, 768 [151 Cal.Rptr. 197].)

Schroeder argues the Vote 2000 program expenditures were illegal based on two separate theories. He principally argues that a city is barred from spending funds to campaign for passage of a ballot measure because it advocates a political purpose, and that the Vote 2000 program transgressed this prohibition. He alternatively argues that even if the Vote 2000 program was a voter registration drive rather than a prohibited political campaign, a city, in contrast to a county or the state, may not spend funds to promote voter registration.

### 1. *The Vote 2000 Program Was Not an Unlawful Political Expenditure*

Schroeder argues the funds spent on the Vote 2000 program were political expenditures under the Political Reform Act of 1974, Government Code section 81000 et seq. (hereafter, PRA), and were therefore unlawful under *Stanson v. Mott, supra,* 17 Cal.3d 206. Although Government Code section 82025 generically defines an expenditure as any "payment . . . unless it is clear from the surrounding circumstances that it is not made for political purposes," the PRA does not define the term "political purposes." We therefore examine the rules and regulations adopted by the Fair Political Practices Commission (FPPC) for guidance on whether the funds spent on the Vote 2000 program were political expenditures.[4] (*Yes on Measure A v. City of Lake Forest* (1997) 60 Cal.App.4th 620, 624 [70 Cal.Rptr.2d 517].) The FPPC has adopted an implementing regulation (Cal. Code Regs., tit. 2, § 18225, hereafter Regulation 18225), which provides:

"(a) An expenditure is any monetary or nonmonetary payment made for political purposes. A payment is made for political purposes if it is:

"(1) For the purpose of influencing or attempting to influence the action of the voters for or against the nomination or election of a candidate or candidates, or the qualification or passage of any measure; or

---

[4] The FPPC is responsible for "[p]rovid[ing] assistance to agencies and public officials in administering the provisions" of the act (Gov. Code, § 83113, subd. (c)) and is authorized to adopt "rules and regulations to carry out the purposes and provisions" and that are "consistent with" the act. (Gov. Code, § 83112.)

"(2) Made by:

"(A) A candidate . . . ;

"(B) A controlled committee;

"(C) An official committee of a political party . . . ; or

"(D) An organization formed or existing primarily for political purposes as defined in subsection (a)(1) . . . .

"(b) 'Expenditure' includes any monetary or non-monetary payment made by any person, other than those persons or organizations described in subsection (a), that is used for communications which expressly advocate the . . . passage or defeat of a clearly identified ballot measure. [¶] . . . [¶]

"(2) A communication 'expressly advocates' the nomination, election or defeat of a candidate or the qualification, passage or defeat of a measure if it contains express words of advocacy such as 'vote for,' 'elect,' 'support,' 'cast your ballot,' 'vote against,' 'defeat,' 'reject,' 'sign petitions for' or otherwise refers to a clearly identified candidate or measure so that the communication, taken as a whole, unambiguously urges a particular result in an election."

We construe Regulation 18225 to provide that a payment made by persons other than those identified in subdivision (a)(2) is an expenditure under the PRA only if it *expressly advocates* the nomination, election or defeat of a candidate or the qualification, passage or defeat of a measure, either because it contains express words of advocacy or because "taken as a whole, [it] unambiguously urges a particular result in an election." (Reg. 18225, subd. (b)(2).) The requirement for express advocacy is included in Government Code section 82031, which defines an "independent expenditure" as a payment for a communication that "expressly advocates the election or defeat of a clearly identified candidate or the qualification, passage or defeat of a clearly identified measure, or taken as a whole and in context, unambiguously urges a particular result in an election but [that] is not made to or at the behest of the affected candidate or committee." The administrative interpretation of the statutory scheme, to which we accord great weight (*Jacobs, Malcolm & Burtt v. Voss* (1995) 33 Cal.App.4th 1399, 1404-1405 [39 Cal.Rptr.2d 774]), reinforces our conclusion that payments for communications are political expenditures only if the communications include express advocacy. In FPPC advice letter No. I-92-531 (Jan. 15, 1993), the issue was whether a public agency (the Santa Clara County Transit District) had made an expenditure regulated under the PRA by publishing an article in

its newsletter explaining a local ballot measure affecting transportation and directing readers to contact the proponent of the measure if they had any questions. The FPPC determined the article was not an expenditure under the PRA because it did not contain express words of advocacy for or against the measure.

Schroeder argues that subdivision (a)(1) of Regulation 18225 makes all expenditures campaign expenditures subject to the PRA if their purpose is to influence the action of the voters for or against the passage of any measure, and subdivision (b)'s express advocacy requirement is not an alternative category of campaign expenditure. Schroeder's interpretation is unsupported by any case law and is contrary to the FPPC's regulatory opinion.[5] Additionally, Schroeder's interpretation contravenes the specific exemption provided for voter registration programs. Schroeder does not dispute that the communications made as part of the Vote 2000 program facially sought to promote voter registration and to encourage voters to participate in the pending elections. Expenditures to promote voter registration and participation are not deemed campaign contributions if the expenditure does not constitute express advocacy (Cal. Code. Regs., tit. 2, § 18215, subd. (c)(1); cf. Gov. Code, § 82015, subd. (b)(2)(C)(viii)) and the voter registration is conducted without regard to political affiliation.[6] However, under Schroeder's interpretation of Regulation 18225, subdivision (a)(1), the statutory exemption for voter registration activity that is otherwise nonpartisan and does not contain express advocacy would be forfeited if the purpose for registering voters was to influence an electoral outcome.

We conclude the funds spent on the Vote 2000 program were political expenditures, and unlawful under *Stanson*, only if the communications either expressly advocated, or taken as a whole unambiguously urged, passage or

[5]It also appears Schroeder's interpretation makes Government Code section 82031 inoperative. That section defines an "independent expenditure" to be a payment, although not made to or at the behest of the candidate or sponsoring committee, that "expressly advocates" or "unambiguously urges" the election or defeat of a clearly identified candidate or measure. Under Schroeder's construction, however, all expenditures (including ones not made to or at the behest of the candidate or sponsoring committee) would qualify as expenditures if the *purpose* was to influence voters, regardless of the *content* of the communication.

[6]In FPPC advice letter No. A-92-102, the FPPC opined that the expenditures by the "Carson 'Get Out the Vote' Committee" were for a nonpartisan voter registration program, contained no express advocacy within the meaning of California Code of Regulations, title 2, section 18215, were independent expenditures not containing any express advocacy within Government Code section 82031, and thus were not political expenditures under the PRA. In an opinion requested by Valley Oak, an organization seeking to encourage and facilitate voter registration regardless of party affiliation, the FPPC again opined Valley Oak's activity was not political campaigning under the PRA because it was nonpartisan and contained no express advocacy. (*In re Valley Oak* (Nov. 7, 1978) FPPC Dec. No. 78-011 [4 FPPC Opns. 78; 1978 WL 43279].)

defeat of Measure F. (Reg. 18225, subd. (b).) The written materials sent to voters as part of the Vote 2000 program did not contain express words of advocacy in favor of Measure F, such as "vote for," "elect," "support," "cast your ballot," "vote against," "defeat," "reject," or other equivalent language. The written materials sent to voters, taken as a whole, did not unambiguously urge a yes vote on Measure F. Most of the written material sent as part of the Vote 2000 program did not even identify Measure F, either by title or subject matter. The only written material that identified Measure F by title was a color brochure that stated, "Here are many good reasons for you to vote in the March 2000 election" and contained an extensive listing of the candidates for national and state offices, a list of 21 statewide initiatives identified by their number and official short title, and a paragraph identifying Measure F by its official title. Although this brochure unambiguously urges that the reader *should* cast a vote, it does not unambiguously urge the reader *how* to cast his vote.

Schroeder argues that, under *Federal Election Com'n v. Furgatch* (4th Cir. 1987) 807 F.2d 857, a determination of whether there was express advocacy cannot be determined solely based on the content of the communication, but instead must also consider the context of the speech. (*Id.* at pp. 863-864.) Schroeder argues that, in the context of respondents' prior anti-airport messages and expenditures, and the historical tendency of City's voters to vote against the proposed airport, City's Vote 2000 message urging the electorate to vote qualifies as express advocacy in favor of Measure F. However, most federal courts have eschewed efforts to transform ambiguous messages into express advocacy based on external contextual factors (see *Federal Election Com'n v. Christian Action Network* (4th Cir. 1997) 110 F.3d 1049, 1055-1056) and instead have adhered to a bright-line test requiring express words of advocacy. (See, e.g., *Federal Election Com'n v. Christian Action Network* (W.D.Va. 1995) 894 F.Supp. 946, 958.) Moreover, even if *Furgatch* retains vitality, Schroeder overstates the extent to which it permits reference to *external* context. *Furgatch* "interpret[ed] and refine[d]" or made "more comprehensive" the definition of express advocacy set out in *Buckley v. Valeo* (1976) 424 U.S. 1 [96 S.Ct. 612, 46 L.Ed.2d 659]. Because *Furgatch* believed *Buckley*'s list of words of advocacy did "not exhaust the capacity of the English language to expressly advocate the election or defeat of a candidate," it permitted evaluation of the internal *textual* context of the words used to determine whether the speech as a whole constituted express advocacy. (*Furgatch, supra,* 807 F.2d at pp. 861-863.) *Furgatch*'s focus was on the communication itself, not external factors, because it stated at page 864 that to qualify as express advocacy the speech: "must, when read as a whole, and with *limited* reference to external events, be susceptible of no other reasonable interpretation but as an exhortation to vote for or against a

specific candidate. This standard can be broken into three main components. First, even if it is not presented in the clearest, most explicit language, speech is 'express' for present purposes if its message is unmistakable and unambiguous, suggestive of only one plausible meaning. Second, speech may only be termed 'advocacy' if it presents a clear plea for action, and thus speech that is merely informative is not covered by the Act. Finally, it must be clear what action is advocated. Speech cannot be 'express advocacy of the election or defeat of a clearly identified candidate' when reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action." (Italics added.)

Thus, even under *Furgatch*, the message must clearly and unmistakably present a plea for action, and identify the advocated action; it is not express advocacy if reasonable minds could differ as to whether it encourages a vote for or against a candidate or encourages the reader to take some other kind of action. Although the color brochure contained a message and plea for action that is clear, the action advocated was to register and vote in the upcoming election. There is no internal textual hint of a plea to vote for or against any ballot measure or candidate. Even if some limited consideration could be given to the external context, the communication is at a minimum susceptible to a reasonable interpretation other than as an exhortation to vote in favor of Measure F.

We conclude that the Vote 2000 program written communications, whether tested under Regulation 18225, the majority federal rule, or *Furgatch*, do not qualify as express advocacy and therefore are not the result of political expenditures.

2. *Respondents Are Not Barred from Spending Funds to Encourage Voter Registration*

Schroeder alternatively argues that even if the Vote 2000 program was not a prohibited political campaign, local governments, in contrast to county and state governments, are barred from spending funds on programs encouraging voter registration and participation because numerous provisions of state law expressly charge the California Secretary of State and counties with that function. Municipalities have broad discretion to make public expenditures, subject to the limitations that the expenditure is for a "public purpose" (*County of Alameda v. Janssen* (1940) 16 Cal.2d 276, 281 [106 P.2d 11, 130 A.L.R. 1141]) and is not expressly forbidden by general state law or the city's charter. (*West Coast Adver. Co. v. San Francisco, supra,* 14 Cal.2d at pp. 521-522.) Although state law requires the state and county governments to undertake certain voter registration activities,

Schroeder cites no general state law *precluding* local governments from supplementing that effort.[7] Accordingly, City may spend funds to encourage voters to register and vote as long as the expenditure furthers a public purpose. "The determination of what constitutes a public purpose is primarily a matter for [the legislative body]" (*County of Alameda v. Janssen, supra,* at p. 281), and "all presumptions favor its validity, and it will be upheld unless its [illegality] clearly and unmistakenly appears." (*Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199, 206 [56 Cal.Rptr.2d 732].) The public policy and purpose of encouraging citizens to exercise their franchise is unmistakable (see generally Elec. Code, §§ 2103, 2105), and therefore expenditures for the Vote 2000 program are within the broad concept of a public purpose for which municipal funds may be spent.

**B.** *The Trial Court Did Not Err by Denying Schroeder's Request to Conduct Discovery*

■ Because respondents' section 425.16 motion triggered an automatic stay of discovery under section 425.16, subdivision (g), Schroeder moved to continue the hearing on respondents' motion to strike to permit the court to hear and determine his pending motion for leave to conduct specified discovery. Schroeder argued the proposed discovery could produce evidence that the Vote 2000 program was an unlawful political campaign. The court denied the motion.

■■ Although a section 425.16 motion to strike stays discovery, the court for good cause may permit specified discovery. (*Braun v. Chronicle Publishing Co., supra,* 52 Cal.App.4th at p. 1052.) The court in *Lafayette Morehouse, Inc. v. Chronicle Publishing Co., supra,* 37 Cal.App.4th 855 recognized the discovery stay and 30-day hearing requirement of section 425.16, if literally applied in all cases, could adversely affect a plaintiff's due process rights by placing the burden on the plaintiff to show a prima facie case without permitting the collection of evidence needed to satisfy

---

[7]Schroeder also cites Elections Code section 2103, subdivision (e), which permits a city to assign its employees to act as deputy registrars of voters on any premises controlled by the agency during regular working hours. Schroeder then argues that, under the *expressio unius est exclusio alterius* principle of statutory construction (*Clark v. Burleigh* (1992) 4 Cal.4th 474, 489 [14 Cal.Rptr.2d 455, 841 P.2d 975]), this legislative specification of a permissible activity should be construed as the *only* permissible voter registration activity by a municipality. However, the subdivision relied on by Schroeder is part of a particularized provision in which the Legislature, to further its declared intention to promote and encourage voter registration, mandated that counties establish a sufficient number of registration sites for the convenience of people desiring to register. (Elec. Code, § 2103, subd. (a).) Statutory construction seeks to discern and implement the intent of the Legislature, and we do not agree that a provision that authorizes one avenue to promote voter registration should be construed to preclude or restrict other avenues to promote voter registration.

that burden, particularly where the principal source of evidence critical to establishing the prima facie case is in the possession of the defendant and not available from other sources. (*Lafayette*, at p. 868.) Accordingly, the *Lafayette* court stated at page 868 that "[i]f the plaintiff makes a timely and proper showing in response to the motion to strike[] that a defendant or witness possesses evidence needed by plaintiff to establish a prima facie case, the plaintiff must be given the reasonable opportunity to obtain that evidence through discovery before the motion to strike is adjudicated. The trial court, therefore, must liberally exercise its discretion by authorizing reasonable and specified discovery timely petitioned for by a plaintiff . . . , when evidence to establish a prima facie case is reasonably shown to be held, or known, by defendant or its agents and employees." We may not disturb the trial court's ruling on such a discovery request absent an abuse of discretion (*Braun v. Chronicle Publishing Co., supra*, at p. 1052), and we conclude the trial court did not abuse its discretion here.

Schroeder's discovery sought documents and written materials in the possession of respondents and the consultants who designed the Vote 2000 program, and to depose respondents and the consultants about the Vote 2000 program. Schroeder argued that good cause existed for this discovery because it would aid him in showing the Vote 2000 program was an expenditure " '[f]or the purpose[] of influencing or attempting to influence the action of the voters' " on Measure F within the prohibition of *Stanson v. Mott, supra,* 17 Cal.3d 206.

Schroeder's proposed discovery consisted of two basic groups: (1) materials that were both readily available from other sources and were an existing part of the court's file in this matter; and (2) materials that may or may not have been obtainable from other sources but were irrelevant as a matter of substantive law.

The first group of requested discovery included all written communications prepared and sent to the public as part of the Vote 2000 program. Schroeder conceded below that the Vote 2000 program mailers, along with other writings concerning the Vote 2000 program, were part of the court record in this case.[8] The court did not abuse its discretion by refusing to continue the hearing on the motion to strike to collect redundant documents. Schroeder also sought the script for the telephone calls made as part of the

---

[8]Schroeder argues he is entitled to a presumption that there were mailings sent as part of the Vote 2000 program that contained messages urging yes votes on Measure F. However, that argument is contrary to his concession that the Vote 2000 program mailers were provided as exhibits to respondents' motion to strike. Moreover, express advocacy mailers, which presumably were mailed to the public at large, are readily obtainable from other sources, obviating any need under *Lafayette* for a continuance to obtain that evidence.

Vote 2000 program. He argued the persons placing those telephone calls must have been given a script to follow when speaking to the voter and speculated the script might have included a plea to vote in favor of Measure F. Although the Vote 2000 program did include a telephone campaign, the script containing the authorized "talking points" (which respondents voluntarily provided to Schroeder) did not include express advocacy. Schroeder proffered no evidence other than his own speculation that these scripts included a plea to vote in favor of Measure F. The court did not abuse its discretion in concluding Schroeder had not shown good cause for a continuance to conduct the first group of discovery.[9]

The second group of requested discovery, even assuming it were not obtainable from other sources, sought material that was irrelevant as a matter of substantive law. As discussed above, Schroeder's challenge to the Vote 2000 program required proof the communications expressly advocated passage of Measure F. The majority of the second group of requested discovery sought documents that were *not* part of the program challenged by Schroeder's lawsuit.[10] Communications extraneous to the Vote 2000 program communications cannot be used to show that the Vote 2000 program communications constituted express advocacy under Regulation 18225. To the extent Schroeder's depositions or other document requests sought evidence proving that a facially neutral voter registration campaign was funded because respondents harbored the hope or intent that increased voter participation would aid the passage of Measure F, that evidence was irrelevant.[11] ■ It is well established that a court determines the validity of legislative

[9]The only evidence that any citizen received a telephone call containing anti-proposed airport advocacy was a January 26, 2000, letter from Mr. Simmon to Stan Oftelie. In that letter, Mr. Simmon states he participated in a telephone survey conducted by respondents and complained the interviewer tried to "find any way possible to get me to say I preferred something else in place of the airport" and therefore questioned the validity of the survey's results. There was no evidence that this telephone conversation was one of the "follow-up" telephone calls contemplated by or made as part of the Vote 2000 program; instead, Mr. Simmon's reference to the survey suggests this telephone call may have been part of City's or ETRPA's Great Park or Millennium Plan activities. However, those programs are not challenged in this lawsuit.

[10]Schroeder's proposed discovery sought all documents transmitted to Irvine voters regarding the March 2000 election, or the former Marine base property, directly or indirectly paid for by City or prepared by its consultants. Because these categories were separate from and in addition to the category seeking all documents relating to the Vote 2000 program, the former categories necessarily sought documents sent to voters other than those paid for under the Vote 2000 program.

[11]On appeal, Schroeder denies that the purpose of the depositions was to elicit inadmissible "legislators' intentions" evidence. However, he then identifies as an example of the type of admissible evidence he sought the contract between respondents and consultants for the Vote 2000 program, which may have included a bonus payment to consultants if Measure F passed. The unstated relevance of this bonus clause was to show respondents' purpose for the Vote 2000 program was to promote passage of Measure F, which is precisely the kind of

enactments based on the facial content or effect of the enactment, not by examining the subjective motivations or purposes of the legislators. (*County of Los Angeles v. Superior Court* (1975) 13 Cal.3d 721, 725-727 [119 Cal.Rptr. 631, 532 P.2d 495]; *Board of Supervisors v. Superior Court* (1995) 32 Cal.App.4th 1616, 1623 [38 Cal.Rptr.2d 876] ["[t]he judiciary confines evaluation of a statute to the terms of the legislation itself and will eschew inquiry into what motivated or influenced those who voted on the legislation"; rule applied to local legislature].) ■ Because Schroeder did not show how the second group of discovery requests would have produced evidence relevant to his prima facie showing, the court did not abuse its discretion by refusing to continue the hearing on the motion to provide Schroeder time to conduct the second group of discovery requests. (Cf. *Wachs v. Curry* (1993) 13 Cal.App.4th 616, 623-624 [16 Cal.Rptr.2d 496].)

### C. The Attorney Fee Award Under Section 425.16, Subdivision (c) Is Mandatory and Constitutional

■ Schroeder and amicus curiae argue that if section 425.16, subdivision (c) mandates an attorney fee award against a plaintiff whose complaint against a governmental entity is dismissed under section 425.16, it impermissibly infringes on the plaintiff's First Amendment right to petition for redress of grievances. They argue that when the plaintiff's lawsuit is against a governmental entity, the attorney fee provision's constitutionality can be preserved only by construing it as permissive and subject to a requirement that the plaintiff's lawsuit be deemed frivolous. They alternatively argue that, if the attorney fee provision is not be construed as permissive, it is unconstitutional.

We are not persuaded by Schroeder's argument that the attorney fee provision may be construed as permissive. Section 425.16, subdivision (c) states: "In any action subject to [the special motion to strike], a prevailing defendant . . . shall be entitled to recover his or her attorney's fees and costs. If the court finds that a special motion to strike is frivolous or is solely intended to cause unnecessary delay, the court shall award costs and reasonable attorney's fees to a plaintiff prevailing on the motion, pursuant to Section 128.5." Our Supreme Court has construed section 425.16, subdivision (c) as mandatory. (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131 [104 Cal.Rptr.2d 377, 17 P.3d 735] [subd. (c) provides that "any SLAPP defendant who brings a successful motion to strike is entitled to mandatory attorney

---

"legislators' intent or purpose" evidence he eschews. Because Schroeder did not identify below what admissible evidence the depositions *were* designed to elicit, and has not on appeal cured this silence, we may assume the depositions had no purpose other than to seek inadmissible "legislators' intent or purpose" evidence.

fees"].) We decline Schroeder's invitation to rewrite the statute to exclude governmental entities from the class of defendant entitled to a mandatory attorney fee award. We may not insert words into a statute under the guise of interpretation (*In re Miller* (1947) 31 Cal.2d 191, 199 [187 P.2d 722]), and subdivision (c) contains no language suggesting a legislative intent to exclude governmental entities from the class of defendants entitled to a mandatory attorney fee award. The appellate courts that have considered this issue have concluded section 425.16, subdivision (c) entitles a successful governmental entity defendant to recover attorney fees. (See *Bradbury v. Superior Court, supra,* 49 Cal.App.4th at pp. 1116, 1119; *Mission Oaks Ranch, Ltd. v. County of Santa Barbara, supra,* 65 Cal.App.4th at pp. 729-731.) Schroeder argues that section 425.16, subdivision (c) can be interpreted to require that a governmental entity that is the prevailing defendant on a motion to strike must show the underlying lawsuit was "frivolous, unreasonable or without foundation" as a condition to recovering attorney fees.[12] Schroeder's construction is inconsistent with the mandatory language of section 425.16, subdivision (c) and requires adding words of limitation under the guise of interpretation.[13]

Schroeder alternatively argues that section 425.16, subdivision (c) is unconstitutional if it provides no discretion to deny attorney fees when the successful defendant is a governmental agency. He asserts that because filing suit against a governmental entity represents an exercise of his First Amendment right to petition for redress of grievances (*City of Long Beach v. Bozek* (1982) 31 Cal.3d 527, 534 [183 Cal.Rptr. 86, 645 P.2d 137] (*Bozek*), judg. vacated and cause remanded (1983) 459 U.S. 1095 [103 S.Ct. 712, 74 L.Ed.2d 943], reiterated (1983) 33 Cal.3d 727, 728 [190 Cal.Rptr. 918, 661 P.2d 1072]), a statute that mandates penalties on the exercise of that right is unconstitutional unless it furthers a substantial governmental interest, is

---

[12]Because subdivision (c) lacks either permissive language or any language suggesting a different treatment for governmental entities, the cases cited by Schroeder as permitting us to impose a frivolousness requirement are irrelevant because they examined statutes granting discretion to award attorney fees to a prevailing defendant. For example, the court in *People v. Roger Hedgecock for Mayor Com.* (1986) 183 Cal.App.3d 810, 815-816 [228 Cal.Rptr. 424] adopted a frivolousness standard under statutes that provided the court "may award" attorney fees. (Gov. Code, §§ 91003, subd. (a), 91012.) The *Hedgecock* court merely held that the proper standard to evaluate the discretionary award under those statutes was frivolousness; it did not conclude a mandatory award could be converted into a discretionary award.

[13]Moreover, the Legislature specifically employed language to impose a frivolousness standard in subdivision (c), stating that a court could award fees to a prevailing plaintiff if it found the "special motion to strike is frivolous or is solely intended to cause unnecessary delay." Because the Legislature did not impose frivolousness as an additional hurdle to a prevailing defendant's right to attorney fees, we will not superimpose that requirement under the guise of interpretation. (*Campbell v. Zolin* (1995) 33 Cal.App.4th 489, 497 [39 Cal.Rptr.2d 348] [where Legislature uses language in one part of a statute and omits it in other parts of the same statute, court presumes the Legislature intended a different meaning].)

unrelated to the suppression of exercise of First Amendment rights, and is sufficiently narrow to not chill protected conduct. (*Tily B., Inc. v. City of Newport Beach* (1998) 69 Cal.App.4th 1, 17 [81 Cal.Rptr.2d 6].) He argues that, even conceding that section 425.16, subdivision (c) serves the substantial governmental interest of deterring unmeritorious lawsuits, it is overbroad because it also penalizes plaintiffs whose petitions for redress of grievances are neither frivolous nor in bad faith but simply unmeritorious.

The right to petition for redress of grievances includes the right to sue (*California Transport v. Trucking Unlimited* (1972) 404 U.S. 508, 510 [92 S.Ct. 609, 611, 612, 30 L.Ed.2d 642]) private as well as governmental entities. (*Wolfgram v. Wells Fargo Bank* (1997) 53 Cal.App.4th 43, 50-53 [61 Cal.Rptr.2d 694].) However, "the right to petition has never been absolute" (*id.* at p. 56), and "baseless litigation is not immunized by the First Amendment right to petition." (*Bill Johnson's Restaurants, Inc. v. NLRB* (1983) 461 U.S. 731, 743 [103 S.Ct. 2161, 2170, 76 L.Ed.2d 277].) The *Wolfgram* court recognized that constitutional rights to petition have been subjected to reasonable restrictions to prevent abuse of the right, and narrowly drawn restrictions on that right can be valid. (*Wolfgram, supra,* at p. 57.)

In *Bozek,* the court evaluated whether a government entity could bring a malicious prosecution action against a citizen after his or her lawsuit against the government had terminated in the government's favor. *Bozek* recognized the government, like all defendants subjected to meritless litigation, was injured to the extent it was required to pay attorney fees to defend the lawsuit, and that the government's interest in recovering for this injury and in deterring unwarranted lawsuits was similar to a private person's interest. However, *Bozek* also acknowledged that a citizen's lawsuit against the government represents an aspect of the right to petition for redress of grievances, and the constitutional importance of that right provided a significant countervailing reason against recognition of the right of the government to sue for malicious prosecution. (*Bozek, supra,* 31 Cal.3d at pp. 531-534.) *Bozek* declined to recognize a right of the government to pursue a malicious prosecution action. However, an important reason for rejecting that cause of action was that "existing remedies are adequate to protect the interests of municipalities in obtaining compensation for the expenses incurred in defending against unwarranted lawsuits and in deterring improper suits in the future." (*Id.* at p. 530.) Among the existing remedies that *Bozek* determined would reduce the impact of unwarranted and improper litigation were sanctions under section 128.5. *Bozek* concluded that "[i]n order to avoid the chilling effect upon the constitutional right of petition [that] would result if we were to allow municipalities to maintain actions for malicious prosecution, we conclude the best course is to defer to the legislatively provided remedy." (*Bozek, supra,* at p. 538.)

Thus, *Bozek* recognized that the government is injured by meritless suits, that the right to petition does not provide an absolute immunity to citizens who bring meritless suits, and the Legislature may by statute grant governments the ability to recoup their attorney fees. We glean from *Bozek*, *Wolfgram* and other cases that the right to petition may be subject to legislatively imposed conditions and restrictions, provided the restrictions are narrowly drawn to achieve a substantial governmental interest that is content neutral and unrelated to the suppression of the exercise of First Amendment rights. *Bozek* holds, and Schroeder concedes, that the Legislature may provide for an award of attorney fees to governmental entities for defending against frivolous lawsuits without impermissibly infringing on the right of petition for redress of grievances. We must therefore determine whether section 425.16, subdivision (c), by mandating an award for an unmeritorious but not necessarily frivolous lawsuit against a governmental entity, transgresses constitutional boundaries.

We conclude that section 425.16, subdivision (c) is valid because it seeks to achieve a substantial governmental interest that is content neutral and unrelated to the suppression of the exercise of First Amendment rights and is narrowly tailored to achieve that interest. There is a substantial governmental interest in deterring unmeritorious lawsuits generally, and that interest assumes greater weight in the arena governed by section 425.16, subdivision (c): unmeritorious lawsuits that can chill the defendant's exercise of First Amendment rights. Although Schroeder argues that the statute is designed to suppress protected activity—his right to sue the government—we conclude the statute is primarily designed to *promote and encourage* protected conduct—the right of defendants to exercise their First Amendment rights without fear of unmeritorious SLAPP lawsuits. In *Simpson v. Municipal Court* (1971) 14 Cal.App.3d 591 [92 Cal.Rptr. 417], the court examined the constitutional validity of a statute that prohibited picketing inside the state capitol building. Although *Simpson* recognized picketing was a classic form of petition activity, it also recognized the ban was designed to promote two interests: to avoid disruptions that would "debase[] the quality of [the Legislature's] deliberative processes"; and to prevent patrols of picketers from creating an oppressive atmosphere that might discourage or repel others from visiting and speaking. (*Id.* at p. 597.) *Simpson*, reasoning that this restriction on petition rights *promoted* the First Amendment rights of others, explained at page 598 that: "Many constituents would find these patrols discomfiting, repugnant, even threatening. They would prefer to stay away, to address legislators by other means or not at all. While expressing the pickets' own views, the patrols would tend to chill and repress the views of others. 'To enforce freedom of speech in disregard of the rights of others would be harsh and arbitrary in itself.' (*Kovacs* v. *Cooper* [(1949) 336 U.S.

77, 88 [69 S.Ct. 448, 454, 93 L.Ed. 513, 10 A.L.R.2d 608]]; *In re Kay* (1970) 1 Cal.3d 930, 941 [83 Cal.Rptr. 686, 464 P.2d 142].) The very presence of the patrols tends to block the vital lines of communication between legislators and their constituents."

*Simpson* upheld the law because it banned all picketers equally and without regard to the content of their message, was narrowly tailored to achieve legitimate and substantial governmental interests, and banned only a narrow type of picketing while omitting other forms of picketing from its ambit. (*Simpson v. Municipal Court, supra,* 14 Cal.App.3d at p. 599.) The same analysis convinces us that section 425.16, subdivision (c) is valid. The attorney fee clause applies to all unmeritorious lawsuits premised on acts taken in furtherance of the defendant's constitutional rights of petition or free speech, regardless of the point of view espoused by the plaintiff. It applies only to that narrow category of lawsuits against governmental entities that are premised on acts taken in furtherance of the defendant's rights of speech, and leaves untouched any other type of lawsuit against governmental entities. Finally, it is closely tailored to achieve these substantial governmental interests because it has no application to most lawsuits against governmental entities but instead applies only to lawsuits in which two narrow conditions are satisfied: first, the court must be satisfied that the lawsuit seeks recovery for acts taken in furtherance of the defendant's rights of free speech or petition; and second, the lawsuit must be so lacking in merit that, even when the evidence is viewed most favorably to the plaintiff, the plaintiff cannot prevail as a matter of law. (*Lafayette Morehouse, Inc. v. Chronicle Publishing Co., supra,* 37 Cal.App.4th at p. 867.)

We conclude that frivolousness is not an invariable prerequisite to the constitutional validity of a statute authorizing recovery of attorney fees by a governmental entity, and that section 425.16, subdivision (c) is valid.

## DISPOSITION

The judgment is affirmed. Respondents are entitled to costs on appeal.

Nares, Acting P. J., and Haller, J., concurred.

Appellant's petition for review by the Supreme Court was denied June 26, 2002. Baxter, J., was of the opinion that the petition should be granted.