[No. G035102. Fourth Dist., Div. Three. Dec. 9, 2005.]

CITY OF ANAHEIM, Plaintiff and Appellant, v.
DEPARTMENT OF TRANSPORTATION, Defendant and Respondent.

COUNSEL

Jack L. White, City Attorney, and Moses W. Johnson IV, Deputy City Attorney, for Plaintiff and Appellant.

Bruce A. Behrens, Linda Cohen Harrel, William T. Kamizolas and Robert W. Vidor for Defendant and Respondent.

OPINION

O'LEARY, Acting P. J.—The City of Anaheim (the City), which operates its own electric utility, was required by the California Department of Transportation (Caltrans) to relocate certain electrical transmission facilities to accommodate a freeway widening project. Caltrans is obligated under the Streets and Highways Code to pay for the relocation, but is entitled to a credit against its liability for the amount of any "betterment" to the relocated facilities. The City relocated the transmission facilities by undergrounding them because its municipal code generally requires undergrounding of utilities for aesthetic and safety reasons. At issue in this case is whether Caltrans was obligated to pay the full costs of undergrounding the facilities, or whether it was entitled to a credit for the betterment of the facilities due to the undergrounding. We agree with the trial court that the undergrounding constituted a "betterment," and Caltrans did not abuse its discretion by claiming a credit for the relocation costs attributable to the betterment of the facilities. Accordingly, we affirm.

I

LAW

We depart from our normal practice of first discussing the facts and procedure. We find it useful to instead first set forth the pertinent law regarding Caltrans's statutory obligations regarding the relocation of publicly owned utilities.

Streets and Highways Code section 703 provides in pertinent part, "Whenever [Caltrans] requires a publicly owned utility to relocate within a freeway any utility facility lawfully maintained in any freeway which was not a state highway at the time such utility facility was originally installed therein, [Caltrans] shall pay the cost of such relocation." But there are limitations to Caltrans' obligations. Streets and Highways Code section 705 provides in pertinent part, "In any case in which [Caltrans] is required . . . to pay the cost of removal or relocation of any utility facility, it shall be entitled to credits as follows: [¶] (1) In the amount of any *betterment* to the utility facility resulting from such removal or relocation, not in excess of the cost of the increased capacity of the facility." (Italics added.)

The Caltrans Right-of-Way Manual contains the following pertinent sections. Section 13.04.05.06 states, "[Streets and Highways Code] Section 705—Allowable Credit on Relocation: In any case in which [Caltrans] is required under the provisions of this law to pay the cost of removing or relocating any facility, [Caltrans] shall be entitled to credits as shown in the table entitled Allowable Credits on the following pages."

The table referred to in section 13.04.05.06 of the Caltrans Right-of-Way Manual provides the following regarding betterment credit: "[Caltrans] should only pay for a functional equivalent replacement of the impacted utility facility. Any increase in the size or capacity of the facility that is for the Owner's benefit is considered the Owner's betterment. [Caltrans] shall receive a credit for the difference between the cost of the functional replacement of the original facility and the cost of the facility as constructed. [¶] There are, however, exceptions to the general rule. All betterments that result in increased capacity or more desirable placement, such as undergrounding, that the Owner may claim to be at [Caltrans's] expense must be carefully reviewed. The following types of betterment may be accepted as part of [Caltrans's] liability: [¶] 1. Required by the highway project[;] [¶] . . . [¶] 4. Required by State or Federal law or regulation[;] [¶] 5. Required by current design practices regularly followed by the Owner in their own work, if there is a direct benefit to the highway project. [¶] . . . [¶] Betterment

is normally measured by an increase in size or capacity such as a larger pipe, a greater number of telephone circuits, additional conduits, or a higher capacity power line. . . ."

Finally, section 13.04.07.07 of the Caltrans Right-of-Way Manual provides as follows regarding the undergrounding of utilities: "When a project conflict exists and [Caltrans] must relocate an existing aerial utility facility, [Caltrans] cannot pay any portion of the undergrounding costs unless the undergrounding is based on an engineering need for [Caltrans's] project or is the most cost effective. Undergrounding requirements as established by local government for aesthetic purposes are not binding upon [Caltrans]. [Caltrans] is only obligated to pay for replacement of the functional utility that previously existed."

## II

## FACTS[1] AND PROCEDURE

The City owns and operates a municipal electric utility that serves most of its residents. In 1979, the City adopted chapter 17.24 of the Anaheim Municipal Code requiring the undergrounding of utilities including, when feasible, existing and future overhead electric transmission facilities. Anaheim Municipal Code section 17.24.020 states the purposes of the ordinance, which include improving aesthetics, service reliability, and safety.

The California Public Utilities Commission (PUC) did not mandate the City to adopt an undergrounding ordinance. The PUC has no jurisdiction over municipally owned utilities. Rather, its jurisdiction is over privately owned utilities. However, certain PUC-approved tariff rules require specific private utilities to underground utility transmission facilities at their own expense (under certain circumstances) if the municipality in which the private utilities are located has adopted an ordinance requiring the undergrounding of the transmission/distribution facilities. The City adopted its ordinance, in part, so it could require those private utilities to underground their own facilities at their own expense.[2]

In the mid-1990's, Caltrans began widening the Interstate 5 freeway in the City. The City owned and maintained aerial 12KV electrical power facilities

---

[1] The City and Caltrans stipulated to the pertinent facts.

[2] The tariff rules to which the City refers are tariff rules 20 and 32. Tariff rule 20, is not in the record, but the City represents it applies to Southern California Edison. Tariff rule 32, which is in the record, pertains to Pacific Bell and was approved in 1985—several years after the City adopted its undergrounding ordinance. Nonetheless, Caltrans does not dispute the City's undergrounding ordinance was adopted by the City so it could require private utilities to bear the costs of undergrounding their facilities.

within the freeway right-of-way that had to be relocated to accommodate the widening. The City relocated the facilities underground.

The City and Caltrans entered into four separate "Utility Agreements," each relating to specific phases of the project and specific facilities that needed to be relocated. The City would perform and/or pay for the relocation work and bill Caltrans for its share of the actual costs. In each utility agreement, the City and Caltrans acknowledged Caltrans was required to pay the costs of relocating the power lines, but "will not pay for any betterment or increase in capacity of the [City's] facilities." The parties agreed "that relocation as herein contemplated includes betterment to [the City's] facilities by reason of increased capacity resulting from undergrounding existing aerial facilities in lieu of replacement in kind" and they set forth estimated percentages of the total relocation costs the City would incur that were attributable to the betterment by undergrounding of the facilities. However, they also acknowledged there was a dispute as to whether the betterment was one for which Caltrans was ultimately responsible.[3]

In the stipulated facts, the City agreed undergrounding of the lines in question was "in general, a betterment," and the lines the City "elected to underground . . . were not undergrounded due to engineering reasons, but rather . . . were undergrounded for aesthetic reasons and non-engineering reasons, including [Anaheim Municipal Code] Chapter 17.24."[4]

In 2001, the City filed its claim with the state claims board for the "betterment costs" associated with relocating the disputed lines underground—approximately $2.2 million. After the claim was denied, the City filed the instant action against Caltrans for breach of statute and breach of contract seeking to recover the betterment costs associated with undergrounding the lines. Following a bench trial on stipulated facts, the court ruled in Caltrans's favor.

### III

### DISCUSSION

1. *Caltrans was not required to reimburse the City for the betterment costs.*

The City contends Caltrans was required to pay the full cost of undergrounding its facilities pursuant to Streets and Highways Code sections 703

---

[3] Streets and Highways Code sections 706 and 707 specifically provide for these types of agreements and for a right of a judicial action to adjudicate the obligations and costs to be born by each party pursuant to the agreement or under the statutes.

[4] Apparently some transmission lines had to be relocated underground for engineering reasons and Caltrans paid the full undergrounding costs associated with those lines.

and 705. Acknowledging Caltrans is entitled to a credit towards the relocation costs it must pay "in the amount of any *betterment* to the utility facility resulting from such . . . relocation," the City argues what is meant by "betterment" in Streets and Highways Code section 705 is ambiguous. Thus, the City argues we must resort to the Caltrans Right-of-Way Manual, which contains Caltrans's interpretation of the term "betterment" to ascertain whether in this case undergrounding the utilities was a proper relocation cost.

We agree with the City (and the trial court as it concluded in its statement of decision), the term "betterment" as used in Streets and Highways Code section 705 is somewhat ambiguous. In its ordinary sense, the term "betterment" suggests *any* improvement that makes something better than it was before. (See, e.g., Webster's 3d New Internat. Dict. (1981) p. 209, defining "betterment" as "a making or becoming better: improvement . . . .") But virtually any relocation is going to result in some sort of technical improvement to the facilities relocated. The second phrase of the sentence in question, i.e., Caltrans gets a betterment credit against relocation costs "not in excess of the cost of the increased capacity of the facility[]" suggests a more technical meaning. Accordingly, the trial court appropriately resorted to Caltrans's own interpretation of the term "betterment" as evidenced in its Right-of-Way Manual.

"Courts generally give great weight and respect to an administrative agency's interpretation of a statute governing its powers and responsibilities. [Citation.] 'A court must accord great weight to an administrative agency's construction of statutes it is charged with implementing and enforcing. Such a construction will be adhered to unless clearly erroneous or unauthorized [citations], that is, unless it was arbitrary, capricious or had no reasonable or rational basis [citation].' [Citation.]" (*Jacobs, Malcolm & Burtt v. Voss* (1995) 33 Cal.App.4th 1399, 1404–1405 [39 Cal.Rptr.2d 774]; see also *Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 186 [118 Cal.Rptr.2d 330]; *County of Santa Barbara v. Connell* (1999) 72 Cal.App.4th 175, 185 [85 Cal.Rptr.2d 43].)

Caltrans, in applying Streets and Highways Code section 705, interprets a betterment as "[a]ny increase in the size or capacity of the facility that is for the Owner's benefit . . . ." Caltrans also considers relocation with a "more desirable placement, such as undergrounding[]" to be a betterment. The City conceded relocation of the disputed lines was a betterment because the undergrounding resulted in increased capacity (as stipulated in the Utility Agreements) and a more desirable placement. But, the City contends that pursuant to Caltrans's own interpretation of its relocation obligations, as set forth in its Right-of-Way Manual, the betterment was one Caltrans was *required* to pay for because it was mandated by law and by the City's own design practices.

The City points to the Right-of-Way Manual's section 13.04.05.06 table of betterment credits, which provides betterments "result[ing] in increased capacity or more desirable placement, such as undergrounding . . . *may* be accepted as part of [Caltrans's] liability" (italics added), if required by "State or Federal law or regulation" or required by "current design practices regularly followed by the Owner in their own work, if there is a direct benefit to the highway project."

The City argues undergrounding the transmission facilities pursuant to its municipal code should be deemed to have been required by state law or regulation—specifically PUC tariffs—i.e., the City adopted its undergrounding ordinance so the PUC could require the private utilities to bear the cost of undergrounding their own transmission facilities. We disagree with the City on this point. The City stipulated the PUC did not mandate that it adopt an undergrounding ordinance, nor does the PUC have any jurisdiction over the City's utilities. The City adopted its undergrounding ordinance for a variety of highly laudable public purposes as set forth in its ordinance. (See Anaheim Mun. Code, § 17.24.020.) And by doing so, it clearly benefited from the PUC tariff rules mandating certain private utilities bear the costs of undergrounding their facilities. But the City has pointed to nothing in state or federal law or regulations that required it to underground its own transmission facilities.

The City also argues undergrounding was required by its own current design practices (i.e., its ordinance) and provided a direct benefit to the project in the form of improved aesthetics and safety and, therefore, under Caltrans's rules it was required to pay the full undergrounding costs. Although sentence 5 of the table for section 13.04.04.06 of the Right-of-Way Manual, does not explain what is considered by Caltrans to be a "direct benefit" to the project, section 13.04.07.07 makes clear with regards to the undergrounding of utilities there is a direct benefit to the project when "the undergrounding is based on an engineering need for the State's project or is the most cost effective. Undergrounding requirements as established by local government for aesthetic purposes are not binding upon the State. The State is only obligated to pay for replacement of the functional utility that previously existed." The City stipulated the facilities at issue were not undergrounded due to any engineering need; rather they were undergrounded for other reasons such as aesthetics, service reliability, and safety. Accordingly, the undergrounding does not fit the parameters of the provision the City relies upon.

In short, the City has not demonstrated Caltrans was *required* under either the Streets and Highways Code or the Caltrans Right-of-Way Manual to pay the full costs of undergrounding the utility transmission facilities at issue.

At most it has shown Caltrans has discretion to pay undergrounding costs under certain circumstances. Section 13.04.05.06 of the Right-of-Way Manual provides that under the specified circumstances, full costs of undergrounding "*may* be accepted as part of [Caltrans's] liability" (italics added), and usually the word "may" is discretionary. (See Sts. & Hy. Code, § 7 [" 'Shall' is mandatory and 'may' is permissive"].) The City has not argued, nor do the facts suggest, Caltrans abused its discretion by claiming a betterment credit for a portion of the undergrounding costs.

2.  *The trial court did not abuse its discretion in awarding Caltrans costs for legislative history materials.*

The City contends the trial court abused its discretion by awarding Caltrans $1,230.60 in costs for preparation of legislative history materials relating to Streets and Highways Code sections 703, 705, and 707, because Caltrans never actually submitted the legislative history materials to the trial court. We find no abuse of discretion.

The City relies on Code of Civil Procedure section 1033.5, subdivision (a)(12), which permits recovery of the costs of exhibits "if they were reasonably helpful to aid the trier of fact." The City reasons that because the legislative history materials were not actually submitted to the court, they could not have been "reasonably helpful" to the court. But as stated in *Applegate v. St. Francis Lutheran Church* (1994) 23 Cal.App.4th 361 at pages 363–364 [28 Cal.Rptr.2d 436] "even if the exhibit costs are not authorized by section 1033.5, subdivision (a)(12), they still may be allowed in the trial court's discretion pursuant to subdivision (c)(4). . . . [Code of Civil Procedure section] 1033.5, subdivision (c)(4) provides that '[i]tems not mentioned in this section and items assessed upon application may be allowed or denied in the court's discretion.' Items not specifically allowable under subdivision (a) and not prohibited under subdivision (b) may nevertheless be recoverable in the discretion of the court if 'reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation.' ([Code Civ. Proc.,] § 1033.5, subd. (c)(2).) Whether a cost item was 'reasonably necessary' to the litigation presents a question of fact for the trial court and is reviewed for abuse of discretion. [Citation.] [¶] Courts have allowed a variety of costs under authority of this subdivision which were neither specifically authorized nor disallowed by [Code of Civil Procedure] section 1033.5. Allowable costs in the discretion of the trial court may include legislative history material, arbitrator's fees, and the fees of a special master. [Citations.]"

The trial court had discretion to award the costs of the legislative history materials, even though they were not submitted to the trial court, so long as

the court found the costs "reasonably necessary." It did. In view of the City's position the statutes are ambiguous and require resort to other documents for interpretation (i.e., the Caltrans Right-of-Way Manual), we cannot say the trial court abused its discretion.

## IV

## DISPOSITION

The judgment is affirmed. Respondent is awarded its costs on appeal.

Moore, J., and Ikola, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 15, 2006, S140440. George, C. J., did not participate therein.